803 So.2d 629 (2001)
Guerry Wayne HERTZ, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-457.
Supreme Court of Florida.
November 1, 2001.
Rehearing Denied December 21, 2001.
*635 Steven L. Seliger of Garcia and Seliger, Quincy, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Carolyn M. Snurkowski, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Guerry Wayne Hertz. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the judgment and sentence.
In the early morning hours of July 27, 1997, the charred bodies of Melanie King and Robin Keith Spears were found in the victims' burning home in Wakulla County, Florida. Hertz, Jason Looney, and Jimmy Dempsey were each indicted for the firstdegree murders of the victims, and each codefendant was also charged with burglary of a dwelling while armed, armed robbery with a firearm, arson of a dwelling, and use of a firearm during the commission of a felony as a result of this incident. Prior to trial, codefendant Dempsey negotiated a plea with the State and was sentenced to consecutive life sentences in return for providing his testimony at Hertz and Looney's joint trial.
The evidence presented at the trial revealed the following facts. At approximately 11 p.m. on July 26, 1997, Hertz and his codefendants left an acquaintance's house on foot within walking distance from the victims' home. All three men were armed with guns. A resident who lived about 500 yards from the victims testified that Hertz appeared at her door at about 2 a.m. asking to use her phone because "his truck had broken down." When she refused, the trio continued down the road towards the victims' home and, upon seeing the victims' black Mustang, Looney said, "There's my car right there. That's the one I want."
Dempsey and Hertz went to the victims' front door as a decoy and asked if they could use the phone. King provided them *636 with a cordless phone, and Dempsey feigned making a phone call. When Dempsey attempted to return the phone, Hertz pointed his gun at King and forced his way in. Looney then entered and pointed his rifle at Spears. Spears and King were bound and gagged with duct tape and placed face down on their bed. Hertz and his codefendants removed a significant amount of the victims' property, including a VCR, a television, jewelry, furniture, and CDs, and loaded the victims' belongings into the victims' two vehicles. Looney also found approximately $1500 of the victims' money in an envelope, which was ultimately divided equally among the three.
Hertz and Looney concluded that they could leave no witnesses and informed Dempsey of their decision. Dempsey said Hertz and Looney then poured accelerants throughout the victims' home. All three men, still armed, went to the bedroom where the victims were bound, side-byside, face down on their bed. When they entered the back bedroom, King said that she would "rather die being burnt up than shot." She stated, "Please, God, don't shoot me in the head." Hertz replied, "Sorry, can't do that," and then he proceeded to open fire; Looney followed and then Dempsey. The victims died as a result of the gunshot wounds.
Subsequent to the shootings, the victims' home was set ablaze. Hertz drove away in the victims' white Ford Ranger, and Looney drove the victims' black Ford Mustang, with Dempsey as a passenger. According to Dempsey, the whole episode at the victims' home lasted about two hours. The trio proceeded to Hertz's house and unloaded the stolen items and divided up the money. Two employees at the Wal-Mart in Tallahassee testified that the three men made purchases at the store at around 5 a.m. the morning of the murders, before "showing off" their new vehicles, i.e., a black Mustang and a white Ford Ranger, to both of the employees. A Wal-Mart receipt for a clothing purchase was later found in the victims' Mustang, corroborating the employees' testimony.
Hertz and his codefendants made their way to Daytona Beach Shores where, later that day, they were involved in a pursuit and shootout with police. Looney and Dempsey were arrested after abandoning and fleeing from the victims' black Mustang. Hertz abandoned the victims' Ford Ranger after being shot, and he paid a cabdriver $100 to drive him to his aunt's house in St. Augustine. Hertz was arrested that same day in St. Augustine, and victim Spears' .9mm gun was recovered from Hertz's bag.
A firearms expert with FDLE testified that one of the bullets recovered from the area of the victims' burned bed was fired from the .380 Lorcin handgun recovered from Looney at the time of his arrest in Daytona Beach, i.e., the same handgun owned by Keith Spears and used, according to Dempsey, by Hertz to shoot the victims. The other bullet was fired from a.30 caliber carbine rifle, not inconsistent with .30 caliber rifle used by Looney to shoot the victims, and later recovered in the victims' Mustang. A roll of duct tape, Looney's wallet with $464, and Dempsey's wallet with $380 were also found in the Mustang. A fingerprint analyst with FDLE analyzed latent fingerprints taken from the Mustang and concluded that Hertz and his codefendants had all touched the car. The chemist found evidence of various accelerants on items of clothing found in the Mustang. In addition, a law enforcement investigator with the State Fire Marshal's Office testified that the kind of damage that was done by the fire does not happen unless an accelerant is used.
*637 The state medical examiner testified that the bodies were severely burned. He graphically detailed the condition of the bodies as depicted in the photographs: the legs were burned off below the knees, the hands were burned to nubs, the bones of the arms were fractured by the fire, and the skulls were burned partially away. The victims had to be positively identified by dental records. The medical examiner also testified that there could have been other injuries that were not detected due to the extensive burns.
King was shot at least two times in the head, which caused her death. However, the medical examiner was not able to trace the path of the bullet because the skull was burned away. He testified that it was possible that other bullets struck the body, which could not be determined because of the fire. King lived one to two minutes after she was shot. However, there was no soot in the trachea, indicating that she was not alive when the fire started. Spears was shot at least one time in the head, which caused his death. The bullet went in the back of the neck and exited above the right eye. Spears also lived one to two minutes after he was shot, and again, no soot was discovered in his trachea, meaning that he was dead at the time of the fire. The defense did not present any evidence.
A jury convicted both Hertz and Looney of the first-degree murders of King and Spears, burglary of a dwelling while armed with a firearm, armed robbery with a firearm, arson of a dwelling, and use of a firearm in the commission of a felony. By a majority vote of ten to two, for each murder, the jury recommended and advised that the death penalty be imposed against Hertz and Looney. By written order, the judge imposed a sentence of death for each murder.
With respect to Hertz, the trial court found as aggravating factors that (1) the capital felony was committed by a person convicted of a felony and who was on felony probation; (2) the capital felony was committed by a person previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (3) the capital felony was committed while Hertz was engaged in the commission of a burglary, arson, and robbery; (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (5) the murder was committed for financial or pecuniary gain (the court merged this aggravating factor with the fact that the capital felony was committed during the course of a burglary, arson, or robbery); (6) the murder was especially heinous, atrocious, or cruel, and (7) the murder was cold, calculated, and premeditated without any pretense of moral or legal justification.
In mitigation, the trial court found (1) Hertz's impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was given some weight; (2) his age of 20, which was given only moderate weight; (3) as to all other nonstatutory mitigation, (a) Hertz's difficult childhood was given significant weight; (b) the fact that Hertz had no significant criminal history or no history of violence and the fact that he posed no problems since being incarcerated were given marginal weight; (c) that Hertz's remorse and the fact that he cried during some of the testimony and when he made his statement to the court was given moderate weight; (d) the fact that society would be adequately protected if he were to be given a life sentence without the possibility of parole was entitled to "no weight" and (e) the fact that a codefendant, Dempsey, received a life sentence following a plea, was given significant weight *638 and substantially considered by the trial court.[1] On appeal, Hertz raises a variety of challenges to his convictions and death sentence.[2]

Voir Dire
First, Hertz argues venireperson Free was impermissibly struck from the jury venire on the erroneous grounds that her opposition to the death penalty rose to the level justifying exclusion under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The United States Supreme Court has articulated the standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment:
[The] standard is whether the juror's view would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ... [T]his standard likewise does not require that a juror's bias be proved with "unmistakable clarity."
Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (footnote omitted) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)). "The trial judge has the duty to decide if a challenge for cause is proper, and this Court must give deference to the judge's determination of a prospective juror's qualifications." Castro v. State, 644 So.2d 987, 989 (Fla.1994) (citing Witt, 469 U.S. at 426, 105 S.Ct. 844).
The decision to deny a challenge for cause will be upheld on appeal if there is support in the record for the decision. See Gore v. State, 706 So.2d 1328, 1332 (Fla.1997). "It is within a trial court's province to determine whether a challenge for cause is proper, and the trial court's determination of juror competency will not be overturned absent manifest error." Fernandez v. State, 730 So.2d 277, 281 (Fla.1999) (citing Mendoza v. State, 700 So.2d 670, 675 (Fla.1997)). "A trial court has latitude in ruling upon a challenge for cause because the court has a better vantage point from which to evaluate prospective jurors' answers than does this Court in our review of the cold record." Mendoza, 700 So.2d at 675.
In Hannon v. State, 638 So.2d 39 (Fla.1994), this Court stated that "[t]he inability to be impartial about the death penalty is a valid reason to remove a prospective juror for cause." In the instant *639 case, venireperson Free unequivocally stated during three separate responses that she could not impose the death penalty.[3] Moreover, counsel for the defendants attempted to rehabilitate Free under a misconceived notion that because a juror may be willing to convict a defendant of first-degree murder, there is no need for that juror to have an open mind with regard to both the aggravation and mitigation to be presented in the penalty phase of a case. The record is clear, however, that Free was not willing to consider all of the penalties provided by state law, i.e., the death penalty, and, therefore, the State's challenge for cause was properly upheld. See Gore, 706 So.2d at 1332; see also Castro, 644 So.2d at 989.[4] For the foregoing reasons, we find no manifest error by the trial court in excusing venireperson Free for cause and, therefore, deny Hertz's claim.

Competency
Hertz next argues the trial court erred in finding him competent to stand trial. "In determining whether a defendant is competent to stand trial, the trial court must decide whether the defendant `has sufficient present ability to consult with his lawyer with a reasonable degree of rational understandingand whether he has a rational as well as a factual understanding of the proceedings against him.'" Hardy v. State, 716 So.2d 761, 763-64 (Fla.1998) (quoting Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)); see also § 916.12(1), Fla.Stat. (1993); Fla. *640 R.Crim.P. 3.211(a)(1). "The reports of experts are `merely advisory to the [trial court], which itself retains the responsibility of the decision.'" Hunter v. State, 660 So.2d 244, 247 (Fla.1995) (quoting Muhammad v. State, 494 So.2d 969, 973 (Fla. 1986)). "In situations where there is conflicting expert testimony regarding the defendant's competency, it is the trial court's responsibility to consider all the evidence relevant to competency and resolve the factual dispute." Hardy, 716 So.2d at 764 (citing Hunter, 660 So.2d at 247, and Watts v. State, 593 So.2d 198, 202 (Fla.1992)). "The trial court's competency decision will be upheld absent a showing of abuse of discretion." Hardy, 716 So.2d at 764 (citing Hunter, 660 So.2d at 247, and Watts, 593 So.2d at 202).
The record reflects that a competency hearing was held April 7, 1999. At the conclusion of said hearing, the trial court, after reviewing all three doctors' reports, reviewing the rules, and observing Hertz, concluded that Hertz had sufficient present ability to consult with his attorney if he chose to do so and had a factual understanding as well as a rational understanding of what was occurring at trial. Accordingly, the trial court found Hertz competent to stand trial.
Although two defense experts found Hertz incompetent, Dr. Thomas Conger, a licensed clinical psychologist with over 29 years of neuropsychology experience, testified that, in his expert opinion, Hertz was competent to stand trial. Dr. Conger testified that his opinion was based upon interviews and evaluations conducted with Hertz during two separate meetings lasting a total of approximately seven hours. At this time, Dr. Conger administered a comprehensive neuropsychological test battery as well as some additional testing that goes along with the comprehensive battery. Although Dr. Conger did find some evidence of learning disabilities and verbal difficulties, the results from four tests (designed to determine whether Hertz might be malingering) led Dr. Conger to question whether Hertz was putting forth his maximum effort during the testing.
Moreover, the fact that Hertz had performed within normal limits on most of the tests administered to him would suggest that he was able to sustain his attention effectively. It was Dr. Conger's conclusion that if Hertz wanted to assist his attorney, he certainly had the abilities and memory of events in order to do so. He observed that Hertz, based on the tests given, can and does sustain performance at a normal level whether on medication or not. Accordingly, Dr. Conger testified that it was his opinion that Hertz was competent to stand trial.
Despite Hertz's alleged Attention Deficit Hyperactivity Disorder (ADHD), defense expert Dr. D'Errico agreed that Hertz understood the charges (and potential penalties) against him, was aware of the roles and functions of the courtroom personnel, and had a full-scale IQ score of 91, and it was a possibility that Hertz's self-abusive behavior (i.e., banging his head against the wall) could be evidence of malingering.[5] Dr. D'Errico also indicated that everything Hertz said was coherent and understandable. Along the same lines, defense expert Dr. Sesta also indicated that Hertz understood the charges (and associated penalties) against him, was aware of the roles and functions of courtroom personnel, and had a full-scale IQ score of 94 with no evidence of schizophrenia, bipolar disorder, *641 or any other major mental illness. He indicated that Hertz was clearly able to understand the "waiver" discussion the two engaged in and, at times, exhibited "disingenuous qualities" during his interviews.
Finally, the trial court's ruling clearly indicates that the trial court considered and, based upon its own observations, reasonably rejected the defense experts' opinions that Hertz's alleged distractability and hyperactivity would impede Hertz's ability to assist his attorney during trial:
[T]he Court began to pay more attention to the activities of the defendant and it does not appear to the Court that there is sufficient indication of any hyperactivity. The Court would specifically note that on one occasion when the witness Hathcock [fellow inmate] was presented the defendant's attention became immediately focused and attentive.[6]
Although there were conflicting opinions from experts on the issue of competency, we find it was in the sound discretion of the trial court to resolve the dispute and that the trial court did not abuse its discretion in finding Hertz competent to stand trial. See Hardy, 716 So.2d at 764 (holding trial court did not abuse discretion in finding defendant competent where there was conflicting expert testimony regarding the defendant's competency).

Gruesome Photographs
Next, Hertz argues that the trial court erred by admitting into evidence several particularly gruesome photographs of the victims' bodies. In Czubak v. State, 570 So.2d 925 (Fla.1990), this Court discussed the admissibility of gruesome photographs:
This Court has long followed the rule that photographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance. Where photographs are relevant, "then the trial judge in the first [instance] and this Court on appeal must determine whether the gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jury and [distract] them from a fair and unimpassioned consideration of the evidence." We have consistently upheld the admission of allegedly gruesome photographs where they were independently relevant or corroborative of other evidence.
Id. at 928 (citations omitted).
With respect to the first photograph at issue, i.e., State's Exhibit 1-C (depicting the charred bodies of the victims as found at the crime scene), this Court has found no abuse of discretion in admitting allegedly inflammatory photographs when relevant "to assist the crime scene technician in explaining the condition of the crime scene when the police arrived." Pope v. State, 679 So.2d 710, 713 (Fla.1996). We find State's Exhibit 1-C is relevant to show the position and location of the bodies when they were found by police and assisted the crime scene technician in describing the crime scene. See Pope, 679 So.2d at 713-14; see also Pangburn v. State, 661 So.2d 1182, 1188 (Fla.1995) (finding no abuse of discretion in admitting gruesome photographs when "introduced to assist a law enforcement officer in documenting the scene where the victims were found"); Nixon v. State, 572 So.2d 1336, 1342 (Fla.1990) (finding no abuse of discretion in admitting seven gruesome photographs of victim in charred state when *642 "introduced to aid the detective in explaining the condition of the crime scene when the police arrived").[7]
Hertz next argues the gruesome autopsy photos, i.e., State's Exhibits 39-A through 39-E, were not used by the medical examiner to illustrate his opinion of the cause of death and were, therefore, irrelevant.[8] This Court has stated that autopsy photographs may be admissible when used to "illustrate the medical examiner's testimony and the [victim's] injuries," Pope, 679 So.2d at 714, or when "relevant to the medical examiner's determination as to the manner of the victim's death," Mansfield v. State, 758 So.2d 636, 648 (Fla.2000). Moreover, "[t]o be relevant, a photo of a deceased victim must be probative of an issue that is in dispute." Almeida v. State, 748 So.2d 922, 929 (Fla. 1999).
In this instance, the jury viewed two gruesome autopsy photographs showing the effects of the fire, which, all parties agree, occurred after the victims' deaths.[9] Because the victims' bodies were so damaged by the fire, neither of the admitted autopsy photos (each depicting close-ups of *643 the charred remains of the victims) are probative of the medical examiner's determination as to the manner of the victims' deaths. The photographs at issue were only used by the medical examiner to describe the damage done to the victims' bodies by the ensuing fire.[10] Said another way, the damage caused to the deceased victims' bodies by the fire after their deaths was not an issue in dispute. Moreover, the medical examiner's testimony about the cause of death did not rely at all on the photographs.[11]
Because the photographs were not relevant, that is, not probative of any fact in issue, we find it was error to admit the autopsy photographs. See Almeida, 748 So.2d at 930. However, given Dempsey's direct evidence implicating Hertz, the physical and testimonial evidence corroborating Dempsey's account of the events, and the minor role the autopsy photos played in the State's case, we find any error harmless. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986); see also Almeida, 748 So.2d at 930 (finding admission of irrelevant autopsy photo harmless "in light of the minor role the photo played in the State's case"); Thompson v. State, 619 So.2d 261, 266 (Fla.1993) (finding error in admission of irrelevant autopsy photographs harmless).[12]

Collateral Crime Evidence
Hertz next claims the trial court erred in admitting evidence of collateral crimes committed in Volusia County. This Court has stated that the admission of evidence is within the trial court's discretion and will not be reversed unless defendant demonstrates an abuse of discretion. See Medina v. State, 466 So.2d 1046 (Fla.1985); Jent v. State, 408 So.2d 1024 (Fla.1981). "Even if the evidence in question tends to reveal the commission of a collateral crime, it is admissible if found to be relevant for any purpose save that of showing bad character or propensity." Randolph v. State, 463 So.2d 186, 189 (Fla. 1984).

*644 The law is well settled that "[w]hen a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible, being relevant to the consciousness of guilt which may be inferred from such circumstance." Straight v. State, 397 So.2d 903, 908 (Fla.1981). However, we have held that in order to admit this evidence, there must be a nexus between the flight, concealment, or resistance to lawful arrest and the crime for which the defendant is being tried in that specific case. See Escobar v. State, 699 So.2d 988 (Fla.1997). Moreover, such an interpretation should be made with a sensitivity to the facts of the particular case. See Bundy v. State, 471 So.2d 9 (Fla.1985) (citing United States v. Borders, 693 F.2d 1318, 1325 (11th Cir. 1982)).
In prior cases, we have upheld the introduction of similar flight evidence as consciousness of guilt where the defendant flees from police after committing a murder. See Shellito v. State, 701 So.2d 837, 840 (Fla.1997) (even though defendant committed several robberies between the murder and his arrest, evidence that defendant resisted arrest the day after the murder was admissible as consciousness of guilt of the murder); Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990) (even though defendant escaped after being arrested for misdemeanor traffic warrants, evidence of escape could be used as consciousness of guilt of the murder); Bundy, 471 So.2d at 20 (evidence of defendant's attempt to flee officers six days after the murder was admissible as consciousness of guilt even though defendant was wanted for several murders in other states). In these cases, we upheld the introduction of the flight evidence even though the flight could have been attributed to different crimes or warrants.
Thomas v. State, 748 So.2d 970, 982 (Fla. 1999).[13]
In the instant case, the nexus between the flight or resistance to lawful arrest and the murders appears as strong as, if not stronger than, that in Thomas. The only collateral crime testimony that was introduced was the testimony of Daytona Beach Shores police officers Shawn Rooney and Greg Howard regarding how, on the day of the murders, Hertz attempted to hit Officer Howard and knock him down with the Ford Ranger.[14] The facts *645 and circumstances surrounding the pursuit and subsequent arrest of Hertz, Looney, and Dempsey were "relevant to the consciousness of guilt which may be inferred from such circumstance." Straight, 397 So.2d at 908.[15]
Hertz also argues that he was unfairly prejudiced by the admission of such evidence because it became the "feature" of this capital murder trial and, thus, this Court should reverse his conviction as it did for the defendant in Steverson v. State, 695 So.2d 687 (Fla.1997).[16] In contrast to Steverson, however, the record in the instant case reflects that the collateral crime evidence that was introduced at the guilt phase of Hertz and Looney's trial was a de minimis part of the evidence presented in support of the murder, robbery, and arson charges. Only three of the State's thirtyfive witnesses discussed the Volusia County pursuit and capture. More importantly, the evidence in the instant case was not nearly as "unnecessary and inflammatory" as this Court concluded was the evidence surrounding the shooting of the police officer in Steverson. See Steverson, 695 So.2d at 690 (finding "the twelve photographs of [the police officer's] injuries alone were so unnecessary and inflammatory that they could have unfairly prejudiced the jury against Steverson"). Accordingly, because the evidence of the defendants' actions in Volusia County was relevant to consciousness *646 of guilt and did not become an impermissible feature of the trial, we deny Hertz's claim.

Sufficiency of Evidence
Hertz next argues that the evidence was insufficient as a matter of law to sustain the convictions. In Williams v. State, 437 So.2d 133 (Fla.1983), this Court enunciated its proper role in evaluating sufficiency of the evidence arguments in capital cases:
[A]n appellate court should not retry a case or reweigh conflicting evidence submitted to a jury or other trier of fact. Rather, the concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment.
It is our function, then, to see if there is substantial, competent evidence to support the verdict.
Id. at 134 (quoting Tibbs v. State, 397 So.2d 1120, 1123 (Fla.1981)) (alterations in original) (citations omitted).
In the present case, the State sought first-degree murder convictions on alternative theories of premeditated murder and felony-murder with the underlying offenses of armed robbery, burglary, or arson. Thus, because a general verdict form was used in this case, in order to affirm Hertz's first-degree murder convictions, there must be substantial, competent evidence supporting either premeditated or felony murder (predicated on armed robbery, burglary, or arson).
In this instance, there is direct evidence that Hertz killed the victims in both a premeditated manner and during the course of a robbery, burglary, or arson.[17] Dempsey's testimony places Hertz together with him and Looney at Tommy Bull's house a few hours before the murder. This testimony was corroborated by Bull himself at trial. Bull also testified that Hertz, Looney, and Dempsey sought a ride from Bull but, after he refused, they "left walking" around 11 p.m. that evening. A resident who lived about 500 yards from the victims' home identified Hertz as the person standing at her door at approximately 2 a.m. seeking to use a phone.
Dempsey testified that it was Hertz who was first to force himself into the victims' home brandishing a .357 gun and subsequently taping up the victim King. In addition, Dempsey testified that, after Looney and Hertz told him the victims had to be killed, Hertz led Looney and Dempsey in the execution-style shooting of the victims. Under these facts, there was clearly sufficient time before the killing for Hertz to have formed a premeditated design to kill.[18]
*647 Dempsey also testified that Hertz participated in the armed robbery of the victims, which occurred contemporaneously with the killings and prior to the arson of their dwelling. Hertz broke a ceiling fan light trying to scare the victims into disclosing where they kept their valuables and, subsequently, took an active part in removing items from the victims' trailer, including approximately $1500 of the victims' cash. Hertz poured accelerants throughout the victims' home and fled the scene in the victims' Ford Ranger truck. Hertz and his codefendants then unloaded the stolen items at Hertz's residence.[19]
Dempsey's direct testimony is corroborated by other State witnesses and evidence. Two Wal-Mart employees each independently identified Hertz as being among the three men who came into Wal-Mart shortly after the time of the murders. Both witnesses specifically recalled seeing Hertz and the others drive off in a black Mustang and the white Ford Ranger. A Wal-Mart receipt later recovered in the Mustang also corroborates Hertz's presence at the Wal-Mart the morning of the murders. Hertz's girlfriend testified that, when she arrived at Hertz's home the day of the murders, she noticed a television, microwave, furniture, and "all different kinds of stuff" that were not there the previous day.
Moreover, a Volusia County Sheriff's Deputy testified that Hertz abandoned the victims' white Ford Ranger while being pursued in Daytona. A Daytona cab driver testified that Hertz paid her $100 to drive him to St. Augustine that same day.[20] Moreover, when Hertz was arrested later that day at his aunt's house in St. Augustine, the victim Spears' .9mm gun was recovered from Hertz's bag. In addition, fingerprints belonging to Hertz, Looney, and Dempsey were all found on the victims' Mustang when it was recovered in Daytona. Therefore, we find there was substantial, competent evidence to sustain Hertz's convictions.
Finding no reversible error as the guilt phase of Hertz's trial, we affirm his convictions.

Victim Impact Evidence
Hertz raises seven issues relating to the penalty phase proceedings. First, Hertz argues that section 921.141(7), Florida Statutes (Supp.1996), allowing the admission of victim impact evidence, is a usurpation of this Court's rulemaking authority vested in it by the Florida Constitution. See art. V, § 2(a), Fla. Const. This issue, however, is procedurally barred. There is no evidence in this record (nor does Hertz allude to any portion of the record) that reflects that the trial court entertained any motion from Hertz concerning the constitutionality of the victim impact statute. See Bertolotti v. Dugger, 514 So.2d 1095, 1096 (Fla.1987); Tillman v. State, 471 So.2d 32, 35 (Fla.1985).

*648 Jury Verdict

Hertz next argues that, in light of the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the trial court erred in denying Hertz's motion to require unanimity in the jury's sentencing recommendation. This Court, however, recently addressed whether Florida's death penalty sentencing scheme violates the principles espoused in Apprendi. See Mills v. Moore, 786 So.2d 532 (Fla.2001). In holding that it does not, this Court stated, "[T]he plain language of Apprendi indicates that the case is not intended to apply to capital schemes." Id. at 537. Thus, "Apprendi preserves the constitutionality of capital sentencing schemes like Florida's." Id. This Court's decision in Mills forecloses Hertz's claim and, therefore, it is denied. See id.

Avoid Arrest Aggravator
Hertz next argues the trial court erred in finding that the murder was committed for the purpose of avoiding arrest. We have said the facts supporting commission of murder to avoid arrest must focus on the defendant's motivation for the crime. See Rodriguez v. State, 753 So.2d 29, 48 (Fla.2000). In order to establish that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody, the evidence must prove that the sole or dominant motive for the killing was to eliminate a witness. See Zack v. State, 753 So.2d 9, 20 (Fla.2000); Consalvo v. State, 697 So.2d 805, 819 (Fla.1996). Mere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator. See Bates v. State, 465 So.2d 490, 492-93 (Fla.1985). Likewise, the mere fact that the victim knew and could identify defendant, without more, is insufficient to prove this aggravator. See Consalvo, 697 So.2d at 819.
In the present case, however, the trial court made the following findings pertaining to this aggravating circumstance:
The evidence clearly established that after the defendant and the co-defendants had entered the dwelling and subdued the victims that it was realized that the victim Melanie King had gone to school with the defendants Hertz and Dempsey. At one time, the victim King and her family lived across the street from the Hertz family. The defendants discussed and determined, especially the defendant Hertz, that they would leave no witnesses. The methodical execution of the victims by the defendant and his co-defendants with multiple shots to the head and destruction of the victims' home and bodies by fire to eliminate evidence establishes a dominant motive to eliminate witnesses and evidence for the purpose of avoiding or preventing arrest. This aggravating factor was proven beyond all reasonable doubt and accorded great weight in determination of any appropriate sentence.
Sentencing Order at 3-4, State v. Hertz, No. 97-214 (Fla.2d Cir.Ct. Feb. 18, 2000).
At trial, Dempsey testified that after examining King's license, he concluded he had gone to school with King and was "pretty sure" that Hertz had as well. Moreover, King's mother testified that she had lived in the same area for approximately 27 years and that Hertz lived across the street, giving rise to the inference that King would have known Hertz. Dempsey also testified that neither he nor Hertz was wearing anything to cover their faces and that he believed the victim had seen his face while he was standing on the porch (and implied it was possible she had also seen Hertz's face). This evidence is unrebutted by any testimony presented by *649 Hertz. So while it is possible the victim knew (and could possibly identify) the defendants, Hertz is correct in asserting that this, alone, is not enough to support establishment of this aggravator. See Consalvo, 697 So.2d at 819.
In this case, however, there is other competent substantial evidence to support establishment of this aggravator beyond a reasonable doubt. First, the avoid arrest aggravator "has been applied to cases in which ... the defendant had expressed an apprehension regarding arrest." Zack, 753 So.2d at 20. In this case, there is direct testimony from Dempsey that the defendants told Dempsey, while the victims were bound and restrained, that "we can't have no witness to all this stuff ... so we're going to have to do this here." This appears to be exactly the type of apprehension regarding arrest this Court finds determinative of establishing the avoid arrest aggravator. See Trease v. State, 768 So.2d 1050, 1056 (Fla.2000) (finding avoid arrest aggravator was supported by witness's testimony that "Trease told her that the victim had to be killed because he could identify them, in addition to evidence that the victim would have been able to identify Trease if he had lived because he and Trease were acquaintances").
This Court has also said this factor may be proved by circumstantial evidence from which the motive for the murders may be inferred. See Preston v. State, 607 So.2d 404, 409 (Fla.1992). Had the sole motive for the murders in this case been for financial gain, the defendants' purpose would have been accomplished upon receipt of the stolen property. See Knight v. State, 746 So.2d 423, 435 (Fla.1998). In addition, Hertz and his codefendants were not prevented in any manner from leaving the premises without injuring or killing, as they had access to both of the victims' vehicles while both victims were immobilized and, therefore, unable to resist. See id. Once the defendants had obtained the victims' property and secured an uncontested getaway, there was no reason for the victims to be killed-except to eliminate them as witnesses. See Thompson v. State, 648 So.2d 692, 695 (Fla.1994) (upholding avoid arrest aggravator where "[o]nce Thompson had obtained the $1,500 check from [the victims], there was little reason to kill them other than to eliminate the sole witnesses to his actions").[21] Accordingly, we find competent, substantial evidence to the support the trial court's finding that, beyond a reasonable doubt, the dominant motive for the murders of the two victims was the elimination of witnesses in order to avoid prosecution.

CCP Aggravator
Hertz next argues the trial court erred in finding the murder was committed in a cold, calculated, and premeditated (CCP) manner.
[I]n order to find the CCP aggravator factor ... the jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), and that the defendant had *650 a careful plan or prearranged design to commit murder before the fatal incident (calculated), and that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification.
Jackson v. State, 648 So.2d 85, 89 (Fla. 1994) (citations omitted); accord Walls v. State, 641 So.2d 381 (Fla.1994).
Additionally, a murder may be both CCP and committed to avoid arrest as long as distinct facts support each circumstance. The facts supporting CCP must focus on the manner in which the crime was executed, e.g., advance procurement of weapon, lack of provocation, killing carried out as a matter of course, whereas the facts supporting the commission to avoid arrest must focus on the defendant's motivation for the crime.
Rodriguez v. State, 753 So.2d 29, 48 (Fla. 2000) (citation omitted) (citing Stein v. State, 632 So.2d 1361 (Fla.1994)).
"The `cold' element generally has been found wanting only for `heated' murders of passion, in which the loss of emotional control is evident from the facts...." Walls, 641 So.2d at 387-88. Here the calm and deliberate nature of the defendants' actions against the victims establish this element beyond any reasonable doubt. In this instance, the victims were bound and gagged for two hours and, thus, were unable to offer any resistance or provocation. More importantly, during this time the defendants had ample opportunity to calmly reflect upon their actions, following which they mutually decided to shoot the victims execution-style in the backs of the their heads. See Walls, 641 So.2d at 388 (holding "execution-style slaying... by its very nature is a `cold' crime").[22]
With respect to the "calculated" prong, Hertz correctly argues that the "plan to kill cannot be inferred solely from a plan to commit, or the commission of, another felony." Geralds v. State, 601 So.2d 1157, 1163 (Fla.1992). Although it appears the defendants initially only sought to steal a vehicle, there is competent substantial evidence that the defendants armed themselves in advance, discussed killing the victims, did so by killing them execution-style, and deliberately poured accelerants throughout the home before lighting the home on fire. See Knight v. State, 746 So.2d 423, 436 (Fla. 1998) (holding "[e]ven if Knight did not make the final decision to execute the two victims until sometime during his lengthy journey to his final destination, that journey provided an abundance of time for Knight to coldly and calmly decide to kill").[23]
With respect to the "heightened premeditation" prong, this Court stated in Alston v. State, 723 So.2d 148 (Fla.1998):

*651 We have previously found the heightened premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder. In this case, as the trial court properly pointed out, appellant had ample opportunity to release [the victim] after the robbery. Instead, after substantial reflection, appellant "acted out the plan [he] had conceived during the extended period in which [the] events occurred."
Id. at 162 (quoting Jackson, 704 So.2d at 505) (citation omitted). In this case, with the victims bound and rendered harmless, the robbery of the victims' valuables complete, and having uncontested access to the victims' vehicles, it is clear the defendants had "the opportunity to leave the crime scene and not commit the murder but, instead, commit[ed] the murder[s]." Id.; cf. Mahn v. State, 714 So.2d 391, 398 (Fla.1998) (finding no heightened premeditation when "rash and spontaneous killing evidenced no analytical thinking, no conscious and well-developed plan to kill").[24]
Finally, there is no evidence, much less a colorable claim, establishing a pretense of moral or legal justification for these murders. As to Hertz, there is no construction of the facts that would support even a fragmentary claim of excuse or justification, or of a defense to homicide, because the victims here were bound and helpless when killed. See Walls, 641 So.2d at 388. Because there is competent, substantial evidence in the record supporting the finding that the murder was cold, calculated, and premeditated without any pretense of moral or legal justification, we hold that the trial court did not err in its finding of the CCP aggravating circumstance.

HAC Aggravator
Next, Hertz argues the trial court erred in finding the murders were committed in a heinous, atrocious, or cruel (HAC) manner. To qualify for the HAC circumstance, "the crime must be both conscienceless or pitiless and unnecessarily torturous to the victim." Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992). On the other hand, this Court has held that "`an instantaneous or near-instantaneous death by gunfire' does not satisfy the HAC aggravating factor." Donaldson v. State, 722 So.2d 177, 186 (Fla.1998) (quoting Robinson, v. State. 574 So.2d 108, 112 (Fla. 1991)). Moreover, "[e]xecution-style killings are not generally HAC unless the state has presented other evidence to show some physical or mental torture of the victim." Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996).
Along these lines, this Court has held that "the actions of the defendant preceding the actual killing are relevant to this aggravator.... [T]he fear and emotional strain of the victim from the events preceding the killing may contribute to its heinous nature." Gore v. State, 706 So.2d 1328, 1335 (Fla.1997) (citations omitted) *652 (citing Swafford v. State, 533 So.2d 270, 277 (Fla.1988)). Accordingly, the HAC aggravating circumstance has been repeatedly upheld where the victims were "acutely aware of their impending deaths." Zakrzewski v. State, 717 So.2d 488, 492-93 (Fla.1998) (quoting Wyatt v. State, 641 So.2d 1336, 1341 (Fla.1994)); see also Donaldson, 722 So.2d at 187; Scott v. State, 494 So.2d 1134, 1137 (Fla.1986).
In this case, the record reveals that aside from holding the victims at gunpoint for over two hours, bound and taped while lying face down in bed, the codefendants poured gasoline, lighter fluid, and turpentine throughout the dwelling prior to shooting the victims. Moreover, the record supports the conclusion that Melanie King was aware that accelerants were being poured throughout the trailer.[25] Although the fire was ultimately determined not to be the cause of the victims' death, the record provides factual proof that, prior to being shot, the victims were tormented with the prospect of being killed by fire or gunshots and, thus, were "acutely aware of their impending deaths." Accordingly, and based upon the aforementioned reasons, we find that there is competent, substantial evidence in the record to support the trial court's finding that this murder was committed in an especially heinous, atrocious, or cruel manner.

Pecuniary Gain Aggravator
Hertz next argues the trial court erred in finding the murder was committed for pecuniary gain. This Court, however, has previously rejected Hertz's argument that the pecuniary gain aggravator in inconsistent with a concurrent finding of the avoid arrest aggravator. See Thompson v. State, 648 So.2d 692, 695 (Fla.1994) (citing Preston v. State, 607 So.2d 404, 409 (Fla.1992)); see also Hildwin v. State, 727 So.2d 193, 195 (Fla.1998) (holding that "in order to establish this aggravator the state must prove beyond a reasonable doubt only that `the murder was motivated, at least in part, by a desire to obtain money, property or other financial gain.'") (quoting Finney v. State, 660 So.2d 674, 680 (Fla.1995)).[26]

Proportionality
Finally, Hertz argues that his death sentences are impermissibly disparate from Dempsey's sentences of life imprisonment. "A trial court's determination concerning the relative culpability of the co-perpetrators in a first-degree murder case is a finding of fact and will be sustained on review if supported by competent substantial evidence." Sexton v. State, 775 So.2d 923, 935 (Fla.2000) (quoting Puccio v. State, 701 So.2d 858, 860 (Fla.1997)).
Although Hertz urges equal culpability with codefendant Dempsey in the present case, the trial court resolved this issue against Hertz in discussing Dempsey's disparate life sentence as a mitigating factor:

*653 Finally, the defendant argues that the life sentences of co-defendant, Dempsey, mitigate and require life sentences for this defendant.
Although in his cross-examination testimony Dempsey testified that he "guessed" he was equally responsible for the acts committed by the three defendants on the night they committed their crimes and that he could have left several times during the course of the defendants' activity and chose not to do so, the totality of the facts and circumstances in the record competently and substantially show that his dastardly culpability and role in this night of terror was less than either of his co-defendants.
Apparently, Dempsey was the brightest and best educated of the three but after the initial violence and hostile entry into the victims' dwelling his role was more of a follower of Hertz and Looney who made the decisions concerning killing the victims and burning down their dwelling in which he reluctantly participated. When advised by Hertz that he and Looney had decided to kill the victims he was told by Hertz that if he did not participate with them there was a bullet for him also.
The State also points out that when Hertz and Looney came over to the place where Dempsey working [sic] on the day of the crimes Looney was armed with a 357 pistol he was displaying. When the three left to go steal a car, Dempsey took duct tape to tape the car window they would break in stealing a car. Dempsey was never seen driving either of the stolen vehicles of the victims. At Wal-mart, only one and a half hours after the murders, Dempsey was quiet and withdrawn while Hertz and Looney were festive and showing off the stolen pickup and Mustang respectively, to the store clerks as their new cars. When Dempsey and Looney were questioned in Daytona, Looney was armed with one of the murder weapons on his person while Dempsey was not armed. Dempsey gave a detailed confession consistent with the evidence less than 24 hours after the murders. According to Major Crum of the Wakulla Sheriff's Department who heard both, Dempsey gave the same consistent statement to him that he gave in his testimony to the jury. In both, Dempsey expressed genuine remorse. Prior to their killing, Dempsey had shown some compassion for the victims in loosening the tape cutting off their circulation and placing a pillow under one of the victims' head. Dempsey was the last to fire his weapon according to his testimony and believed Keith Spears was already dead when he fired. This factor, ably argued to the jury for its significant consideration and weight is entitled to and has been given substantial consideration and weight by the Court herein.
Sentencing Order at 9-11, State v. Hertz, No. 97-214 (Fla.2d Cir.Ct. Feb. 18, 2000). This thorough analysis by the trial court indicates that not only was the issue of the codefendant's life sentence presented to the jury as a mitigating factor, but also that the trial court carefully considered relative culpability.[27]
*654 Furthermore, Ray v. State, 755 So.2d 604 (Fla.2000), upon which Hertz relies, is distinguishable. In Ray, this Court reduced Ray's death sentence to life because his more culpable codefendant received a life sentence. Id. at 611-12. This Court did so, however, because "[m]uch of the evidence points to [the codefendant] as the dominant player in the crimes." Id. at 612 (emphasis added). Moreover, the codefendant "did nearly all the talking during the robbery and appeared to be in command of the operation." Id. (emphasis added). The same cannot be said for the relative actions of Dempsey with respect to Hertz. Indeed, and further unlike the instant case, the trial judge's own remarks in sentencing the codefendant in Ray reflected that "he believed Ray and [the codefendant] to be equally culpable in the shooting." Id. (emphasis added).
Hazen v. State, 700 So.2d 1207, 1214 (Fla.1997), upon which Hertz also relies, is also distinguishable. In Hazen, this Court vacated the defendant's death sentence on disparate proportionality grounds because the codefendant who received life sentence was found to be the "prime instigator" of murder and was, therefore, more culpable. See Hazen, 700 So.2d at 1214 (emphasis added). In Hazen, only the codefendant carried a gun and was the first to enter the home; moreover, the codefendant was not sure "if [the defendant] even knew what was going on." Id. Finally, and in contrast to the instant case, the majority in Hazen also specifically relied upon the defendant not doing the actual killing in reaching its conclusion of disparate treatment. We do not have those facts here. Accordingly, we find that the trial court's finding of relative culpability is supported by competent, substantial evidence and, thus, hold that Dempsey's life imprisonment does not render Hertz's death sentence disproportionate.
Furthermore, in light of the circumstances of this case, including the existence of six aggravating circumstances (i.e., commission while on felony probation; previous conviction of a violent felony; commission during robbery and arson and for pecuniary gain; commission to avoid arrest; CCP; and HAC) and only two statutory mitigating circumstances, we find the imposition of the death penalty to be proportionate when compared to other similar cases. See Brown v. State, 721 So.2d 274 (1998) (affirming death penalty where evidence established four aggravating factorsprior violent felony conviction; murder committed during robbery and pecuniary gain, merged; HAC; and CCPand two nonstatutory mitigating factors); Gordon v. State, 704 So.2d 107 (Fla.1997) (affirming death penalty where evidence established four aggravating factorsmurder during commission of burglary; pecuniary gain; HAC; and CCP and only minimal evidence in mitigation for drowning murder and robbery of victim); Bryan v. State, 533 So.2d 744 (Fla. 1988) (affirming death penalty for execution-style shooting where evidence established six aggravating factorsprevious violent felony; committed during robbery and kidnaping; avoid arrest; pecuniary gain; HAC; and CCPand only minimal nonstatutory mitigation).
For the reasons stated above, we affirm Hertz's convictions and sentences.
It is so ordered.
SHAW, HARDING, and PARIENTE, JJ., concur.
ANSTEAD, J., concurs in result only.
QUINCE, J., concurs as to the conviction and concurs in result only as to the sentence.
*655 LEWIS, J., concurs in result and dissents in part with an opinion, in which WELLS, C.J., concurs.
LEWIS, J., concurring in result and dissenting in part.
I concur in result only and dissent in part because, in my view, the majority's analysis of the admissibility of the autopsy photos here is far too restrictive, and incorrect in its conclusion that it was error and an abuse of discretion to admit such photographs into evidence. The majority's analysis arguably accepts the defense position that if autopsy photos are not specifically used by a medical examiner to illustrate the precise cause or manner of the victim's death, such photographs are, therefore, rendered irrelevant. Further, the majority seems to voice and approve the defense argument that the photos here addressed only the damage inflicted upon the victims by fire after the infliction of gunshot wounds, and such matters were not an issue in the case.
The primary defense objection to the admissibility of these photos at trial was that the photographs were not necessary for the medical examiner to describe the wounds and injuries inflicted upon the victims. The admissibility of photographs, even if gruesome, is not predicated on "necessity." See Bush v. State, 461 So.2d 936, 939 (Fla.1984) (holding "necessity" is not the test for the admissibility of allegedly gruesome photos); Bauldree v. State, 284 So.2d 196, 197 (Fla.1973) (same); State v. Wright, 265 So.2d 361, 362 (Fla.1972) (same). It is clear that photographs are admissible, notwithstanding objections of gruesomeness, where the photos assist the medical examiner in explaining his testimony as to an issue in the case, even though such issue may not be the ultimate disputed fact.
Here, all parties were aware that the evidence would be presented through the testimony of the only alleged eyewitness concerning certain specific events and specific gunshots that were disputed and challenged by the defendants. The next and natural sequence of the evidence would be to examine the results of the crime (the bodies) to determine whether the testimony of the alleged eyewitness could be either confirmed or refuted and, if so, the basis for such conclusion. A proper presentation of the evidence would require no less. We would certainly look to a pathologist or medical examiner to provide testimony related to the presence or absence of a correlation between the testimony and the ultimate scientific findings along with any reasons which would explain the conclusions. The existence of consistencies or discrepancies would be material issues to be developed and explored during trial. No less material and relevant would be the reasons for the presentation of such conclusions or the unavailability or inability to produce such evidence. Thus, in my view, matters related to the gunshot wounds (such as position, number, location, angles, and trajectories) were certainly legitimate issues to be addressed in the evidence as well as matters which would explain why such evidence was not presented or not available, if any. I respectfully suggest that we have previously rendered a decision in Peterka v. State, 640 So.2d 59, 69 (Fla.1994), involving facts and issues sufficiently similar to those presented here, which is directly contrary to the majority's determination of the issue concerning photos. I would follow and apply Peterka.
In Peterka, the defendant was charged with first-degree murder in connection with the gunshot death of his roommate. The defendant provided a statement that the victim had initiated a shoving match which had innocently escalated into a fight. According to the defendant, while he was holding a handgun it had accidentally discharged *656 across the room and struck the victim as he was attempting to rise from a couch.
A medical examiner presented a contrary version of the facts in the form of an opinion that the victim had been shot at close range from behind. The medical examiner was, however, unable to present certain evidence to support this testimony. In affirming the admission of an alleged gruesome photo into evidence depicting the victim's decomposed skull over the same objection voiced by the defendant here, we held:
As to Peterka's relevance argument, we find the photograph relevant to the medical examiner's testimony that not enough tissue remained on the skull to determine the proximity of the gun to the victim's head. Thus, the trial court did not abuse its discretion in admitting the photograph into evidence.
Id. at 69.
In my view, just as the disputed photo depicting the victim's decomposed skull was relevant and related to the inability of the medical examiner to present certain scientific evidence to confirm a version of the facts and was therefore admissible in Peterka, the decision of the trial court here to admit the photos used by the medical examiner to explain why the disputed testimony of an alleged eyewitness concerning gun shots and wounds could be neither confirmed nor refuted upon examination due to the condition of the victims' bodies was not error, and certainly not an abuse of discretion. Therefore, I concur in the result and dissent as to the majority's analysis and decision concerning the autopsy photos.
WELLS, C.J., concurs.
NOTES
[1] In the four noncapital cases, the judge sentenced Hertz to life on the burglary of a dwelling while armed (count III); life on the robbery with a firearm (count IV); 30 years on the arson of a dwelling (count V); and 15 years for the use of a firearm during the commission of a felony (count VI). All sentences were ordered to run consecutive to one another.
[2] Hertz claims: (1) The trial court improperly excused for cause a venire member whose opposition to the death penalty did not prevent or substantially impair her ability to perform her obligations; (2) Hertz was not competent to stand trial; (3) the trial court erred by admitting gruesome photographs of the bodies at the crime scene and the autopsy; (4) the details of the collateral crimes in Volusia county became a feature of the trial causing prejudice that substantially outweighed the probative value of the evidence; (5) the evidence was insufficient as a matter of law to sustain the convictions; (6) the statute authorizing the admission of victim impact evidence is an unconstitutional usurpation of the Court's rulemaking authority under article V, section 2, of the Florida Constitution, making the admission of such testimony unconstitutional and reversible error; (7) the trial court erred in denying the defense motion to require a unanimous verdict; (8) four of the seven aggravating factors upon which the jury was instructed and which the trial court found are legally inapplicable and their consideration was not harmless error; and (9) the death sentence in this case is disproportionate.
[3] The transcript reports the following exchange:

[Prosecutor]: If you do a verdict of guilty of first-degree murder, then the death penalty is a possibility. Could you vote to imposeto convict somebody when the death penalty is a possibility?
[Venireperson Free]: No, sir.
. . . .
[Defense Counsel]: Ms. Free, you saying you can't even vote in the guilt phase whether the person is guilty or innocent because you know that there is a possibility of the death penalty, is that correct?
[Venireperson Free]: Yeah.
. . . .
[Defense Counsel]: So assuming you have all this discussion, an open discussion about the possibility of one sentence or the other, are you going to tell us today that you still couldn't participate in that discussion if you were on a jury?
[Venireperson Free]: I just don't believe that I could actually betake a person life. Even if they were found guilty of killing someone, I would just rather them spend the rest of their life in jail because its not going to bring the person back, anyway.
. . . .
[Defense Counsel]: You would try. But you don't necessarily want to be in that position, do you?
[Venireperson Free]: Well, I mean, if I am, it wouldn't matter. My opinion is I just would not want to take someone else's life, just becauseI mean, I know it's bad that they killed someone or anybody kills anybody, but it wouldn't bring that person back.
[4] Furthermore, Farina v. State, 680 So.2d 392 (Fla.1996), sentence vacated, 763 So.2d 302 (Fla.2000), on which Hertz relies, is inapposite. The juror in question in Farina stated that she would try to be fair and that she would "fairly consider the imposition of the death penalty, depending on the evidence [she] heard in the courtroom," and, in fact, could impose a death sentence in a murder case, depending on the circumstances presented. Farina, 680 So.2d at 396-98. Thus, although she had "mixed feelings" about capital punishment, she never expressed uncertainty about her ability (or unwillingness) to vote for it in a proper case, according to the appropriate legal standards. See id. Moreover, the prosecutor in Farina never stated the ground on which he was challenging this juror, and the Farina trial court apparently granted the State's challenge "because it had just granted a defense challenge." Id. at 398. Therefore, none of the bases supporting this Court's reversal in Farina apply to the instant case.
[5] In addition, the State presented evidence that, while unknowingly being recorded during transport from Volusia County, Hertz said he would "bang his head into the cell" and "make a bloody mess" if it "became necessary."
[6] The trial court's finding was echoed in the court's Order Declaring the Defendant Competent: "Based upon in court observation the Court finds the Defendant does have sufficient present ability to consult with his lawyer if he so chooses."
[7] Moreover, this Court has also said, "[r]elevant evidence which is not so shocking as to outweigh its probative value is admissible." See Pope, 679 So.2d at 714. Although undeniably a gruesome photograph, Exhibit 1-C is probative of other material issues in this case. First, because the picture depicts the bodies lying side-by-side and face down on the victims' bed, it corroborates Dempsey's testimony that the victims were shot execution-style in the backs of their heads while bound face down on their bed. Second, the position of the victims' bodies is also relevant (and, thus, so is Exhibit 1-C) because it assisted crime scene investigator Yao in describing how the victims' bodies "protected" some of the victims' clothing from fire debris and, thus, how such evidence was recoverable for testing of accelerants. Third, the photo assisted the State Fire Marshal investigator during his testimony in describing areas of the bedroom where accelerant was likely poured, e.g., on the flooring immediately surrounding the bed where the photo depicts flooring as completely missing. Fourth, the photo depicted for the jury the massive damage done by the fire to the victims and the area immediately surrounding them such that, as investigator Yao opined, it significantly interfered with the recovery of projectiles and other forensic evidence. Finally, and although not argued by the parties, Exhibit 1-C is also probative of the avoid arrest aggravating circumstance, where it is clear from the photo that the defendants sought to leave no shred of evidence linking them to this crime by torching the victims and their immediate surroundings. See Gudinas v. State, 693 So.2d 953, 963 (Fla.1997) (holding allegedly gruesome photos relevant to proving aggravating circumstance). Nor can State's Exhibit 1-C be called cumulative. Although State's Exhibits 1-T and 1-U are photographs of the victims' charred bed area, these pictures do not provide nearly as clear a depiction of the position of the victims' bodies, nor do they illustrate the burned out flooring immediately surrounding the bed, as does Exhibit 1-C.
[8] Although Hertz argues the jury was improperly shown State's Exhibits 39-A, 39-B, 39-C, 39-D, and 39-E, the record indicates that State's Exhibits 39-B, 39-C, and 39-E were not shown to the jury and were subsequently withdrawn from evidence at the request of the State:

[Prosecutor]: Your honor, yesterday our medical examiner testified, I had introduced five photographs anticipating that he would use those in his testimony and three of those photographs were not used or displayed to the jury. They are State's Exhibit Number 39B, 39C and 39E.
And at this pointI've discussed this with counsel for the defendantsthe State would request that these be removed from the evidence. The jury has not seen them and we'd ask that these exhibits not be part of the evidence. So I'd like to withdraw those from evidence.
Without objection, 39-B, 39-C, and 39-E were removed from evidence.
[9] It was the medical examiner's opinion that the deaths were caused by gunshot wounds and that there was no evidence that the fire caused the deaths, as there was no evidence of soot in either of the victims' tracheas.
[10] Exhibit 39-A is an autopsy photograph depicting the torso and abdomen of the male victim's body. The medical examiner testified that the photograph revealed that there were "extensive burns on the right side and intestinal material coming out of the right side as a result of the burns"; that "a large portion of the arm [was] burned away and ... intestines [were] coming out." (Emphasis added.) Exhibit 39-D is an autopsy photograph depicting the central part of the female victim's body. The medical examiner testified that the photograph revealed that the body was "severely burned"; that there were "extensive burns on the side and extending into the buttock area"; and that "on the left side ... the intestines are coming out of the body cavity as a result of the burns." (Emphasis added.)
[11] In fact, when describing the actual cause of death, i.e., the gunshot wounds, it appears from the record the medical examiner pointed to his own head to demonstrate the entry and exit wounds of the male victimand not to any of the autopsy photos offered by the State.
[12] We also find no error by the trial court in permitting the State to publish the photographs before the jury on the television-like "DOAR" system. First, the trial court here looked at the monitor and its position in the courtroom and found that the pictures were not inordinately enlarged. The trial court even had the 36 inch monitor moved further away from the jury so that they were given the proper perspective. Second, in Ruiz v. State, 743 So.2d 1 (Fla.1999), upon which Hertz relies, this Court found error in the introduction of the blown-up photo because, unlike in the instant case, "the standard-size photo from which the blown-up was made had already been shown to the jury during the guilt phase." 743 So.2d at 8. That was not the case in this instance and, therefore, the trial court did not abuse its discretion in permitting the State to publish the photos on the DOAR system.
[13] In Thomas, this Court found a "strong nexus" between the defendant's flight and the victim's murder such that the trial court did not abuse its discretion in admitting the flight evidence to show consciousness of guilt:

[T]he evidence established that police spotted Thomas eleven days after the murder driving at speeds in excess of 90 miles per hour. After being pursued for a while, Thomas eventually stopped and the officers instructed him and his passenger to show their hands. When Thomas did not respond to this request, one of the officers approached the car, opened the door, and grabbed Thomas. Thomas immediately sped away, and the officer let go of his arm to avoid being dragged down the interstate. A high-speed chase ensued for several miles and ended when Thomas crashed into a ditch, exited the vehicle and fled on foot before eventually being arrested.
Id. at 982-83 (emphasis added).
[14] The sum total of that testimony reflects that Officer Rooney testified that Hertz was driving the Ford Ranger and he saw the truck turn around and start coming back at him and then make a right turn on Hickory Lane. At that point the truck was headed in Officer Howard's direction, and Officer Rooney said he heard a thump and saw a mike go flying into the air. He walked over to Hickory Lane and saw Officer Howard fall down; he got back in his vehicle and then saw the Ford Ranger coming at a high rate of speed in reverse towards his car. He jumped out and watched as the Ranger backed up past him. He positively identified the Ranger being driving by Hertz. At that point, the officer fired his weapon and Hertz drove away. On crossexamination, Officer Rooney testified that the Ranger did not hit him or Officer Howard and he never saw anyone in the Ranger fire a weapon.

Officer Howard testified that he heard a vehicle coming up from behind him and saw a white Ford pickup. The truck hit him and knocked him down. He testified that he could not get out of the way. He positively identified Hertz as the driver of the Ford Ranger and said that as a consequence of being hit he lost his radio and he, too, started shooting at the vehicle. On cross-examination, he testified that the truck hit him from behind; but he sustained no serious injuries.
[15] The cases cited by Hertz as examples of inadmissible collateral crimes do not involve evidence of flight or resistance to arrest. See Gore v. State, 719 So.2d 1197, 1199 (Fla.1998) (holding collateral crime evidence of defendant's "reprehensible action of leaving a two-year-old child naked in a burned and abandoned house in thirty-degree weather" had no relevance in trial and was highly prejudicial); Pope v. State, 679 So.2d 710, 714 (Fla.1996) (finding fact that defendant battered wife in the past irrelevant to the issue of her murder); Czubak v. State, 570 So.2d 925, 928 (Fla.1990) (holding collateral crime evidence that defendant was an escaped convict not relevant).
[16] In Steverson,

the jury heard virtually every detail of the [police officer shooting] case, including every emotional aspect of the shooting, the detective's injuries, his bloodied face, his staggering, his yelling, the frantic "officer down" response by numerous law enforcement officers and undercover agents, the hospital treatment, and the time he had to take off work due to the "deadly force" situation. In addition to a lengthy recitation about the shooting, [the officer] personally and graphically described his injuries; and twelve photographs of his injuries were admitted over objection for review by the jurors. [The officer] went on to narrate how blood dripped over his eyeglasses and face, how he awaited help, staggered down the street and yelled into his radio. He described his medical treatment at the hospital and the birdshot that remained in his body. [The officer's partner] then gave his own "blow-by-blow" recounting of the details surrounding the shooting; and further testified about [the officer's] condition how he saw his partner down on the sidewalk, startled, bloody, and yelling. In addition, two other officers who arrived at the scene shortly after the shooting, but did not witness it, also reiterated for the jury in great detail the nature of [the officer's] injuries, and how police and emergency personnel aided him at the scene.
Steverson, 695 So.2d at 690.
[17] See Davis v. State, 90 So.2d 629, 631 (Fla. 1956) ("Direct evidence is that to which the witness testifies of his own knowledge as to the facts at issue."); see also Ehrhardt, Florida Evidence § 401.1 (2000 ed.) ("Direct evidence is evidence which requires only the inference that what the witness said is true to prove a material fact; e.g., `I saw A shoot B' is direct evidence that A shot B.").

Accordingly, this case is unlike those cases based wholly on circumstantial evidence and thus would require a special standard of review where a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. See, e.g., Thorp v. State, 777 So.2d 385 (Fla.2000); State v. Law, 559 So.2d 187 (Fla.1989).
[18] "Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill." Green v. State, 715 So.2d 940, 943 (Fla.1998). This purpose to kill must exist for such a time before the homicide "to permit reflection as to the nature of the act to be committed and the probable result of that act." Id. at 944.
[19] Hertz argues that this Court should disregard Dempsey's testimony. Determining the credibility of witnesses, however, is within the province of the jury. See Carter v. State, 560 So.2d 1166, 1168 (Fla.1990) (noting that credibility of accomplice's version of murder is question for jury). Thus, it is the jury's duty to weigh the evidence and resolve any factual conflicts, and its findings will not be disturbed on appeal absent a clear showing of error. See Jent v. State, 408 So.2d 1024, 1028 (Fla.1981). It is not within the province of this Court to pass on the credibility of a witness presented at trial. After hearing all of the evidence in this case, the jury clearly chose to believe Dempsey's version of the facts, as much of his testimony was corroborated by testimonial and physical evidence.
[20] Hertz's attempt to flee from police can be considered circumstantial evidence of guilt. See Straight v. State, 397 So.2d 903, 908 (Fla. 1981).
[21] This case is not unlike the circumstances in Riley v. State, 366 So.2d 19 (Fla.1978). In Riley, the defendant and an accomplice entered the business where the defendant worked for the purpose of robbing it. See 366 So.2d at 20. The pair then threatened several of the defendant's coworkers with pistols, forced them to lie on the floor, bound and gagged them, and then shot each of them in the head. See id. In light of the fact the victims knew the defendant and were immobilized and rendered helpless, coupled with one perpetrator's expressed concern for subsequent identification, this Court found that the record supported the conclusion that the victims were killed to avoid identification. See id. at 22.
[22] This case is unlike those cases based entirely on circumstantial evidence where evidence regarding premeditation is "susceptible to ... divergent interpretations." Geralds v. State, 601 So.2d 1157, 1164 (Fla.1992). Here, the evidence regarding the actions of the defendants during the night of the murder was supplied by Dempsey's direct testimony.
[23] Hertz cites Barwick v. State, 660 So.2d 685 (Fla.1995), where this Court concluded that "the evidence presented does not demonstrate that Barwick had a careful plan or prearranged design to kill the victim ... [and, therefore,] the murder was not committed in a calculated manner." See id. at 696. Barwick, however, is distinguishable because, unlike that in the instant case, the murder in Barwick occurred after the victim resisted and during an unexpected struggle. See id. at 689, 696. In this instance, however, there was no victim resistance or struggle provoking the murder, and it is clear that the defendants had a "prearranged design to commit murder" before the execution of the victims and subsequent arson of their home. See Jackson, 648 So.2d at 89.
[24] In Rodriguez v. State, 753 So.2d 29, 46 (Fla.2000), this Court reviewed a strikingly analogous situation and found CCP:

[The defendant] planned a ruse to enter the apartment but formulated a back-up plan to force his way into the apartment if the plan failed; [the defendant] armed himself with a loaded handgun and two pairs of latex gloves so as to not to leave any fingerprints in the apartment if the initial plan did not work; [the defendant] fired an additional shot into each victim from close range to make sure they were dead; none of the elderly victims offered any resistance; each victim was shot while seated and fully compliant....
753 So.2d at 46; see also Willacy v. State, 696 So.2d 693, 696 (Fla.1997) (finding CCP where defendant bound victim, obtained a can of gasoline from the garage, doused victim with gasoline, and set victim on fire).
[25] Dempsey testified there was an odor of gasoline in the mobile home and that King cried that she "would rather die being burnt up in flames than being shot."
[26] Moreover, and although finding the pecuniary gain aggravator was proven beyond a reasonable doubt, the trial judge expressly stated in his sentencing order that he gave "due regard against inappropriate double consideration" and found that this aggravator merged with another aggravator, i.e., that the murders were committed during the course of a burglary, arson or robbery; therefore, both aggravators were only "considered as one" by the trial court. See Sentencing Order at 4, 11, State v. Hertz, No. 97-214 (Fla.2d Cir.Ct. Feb. 18, 2000). Having merged the two, the trial court was correct in setting forth the basis for doing so, as there is ample evidence in the record to prove Hertz benefitted financially from these murders.
[27] Moreover, any argument that this Court should unilaterally reject Dempsey's testimony is also without merit. See Brown v. State, 721 So.2d 274, 282 (Fla.1998) (holding "[t]he question of whether an accomplice is credible and the weight to be given to the testimony are issues for the jury to determine"). Here, the judge and the jury were made aware of Dempsey's guilty plea and sentence, and it was within the judge's and jury's discretion whether to believe Dempsey's testimony. See Brown, 721 So.2d at 282.