941 So.2d 1031 (2006)
Guerry Wayne HERTZ, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-59.
Supreme Court of Florida.
June 22, 2006.
Rehearing Denied October 27, 2006.
*1033 Baya Harrison, III, Monticello, FL and Clyde M. Taylor, Jr., Tallahassee, FL, for Appellant.
Charles J. Crist, Jr., Attorney General and Carolyn M. Snurkowski, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Guerry Wayne Hertz, a prisoner under sentence of death, appeals the circuit court's order denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm the denial of relief.

FACTS AND PROCEDURAL HISTORY
Guerry Wayne Hertz was convicted of the first-degree murders of Melanie King and Robin Keith Spears, burglary of a dwelling while armed with a firearm, armed robbery with a firearm, arson of a dwelling, and use of a firearm in the commission of a felony. See Hertz v. State, 803 So.2d 629, 637 (Fla.2001). The jury, by a vote of ten to two, recommended the death penalty. See id. Following that recommendation, the trial judge sentenced Hertz to death for each murder. In its opinion affirming the convictions, this Court detailed the facts surrounding the murders of King and Spears, as follows:
At approximately 11 p.m. on July 26, 1997, Hertz and his codefendants [Jason Looney and Jimmy Dempsey] left an acquaintance's house on foot within walking distance from the victims' home. All three men were armed with guns. A resident who lived about 500 yards from the victims testified that Hertz appeared at her door at about 2 a.m. asking to use her phone because "his truck had broken down." When she refused, the trio continued down the road towards the victims' home and, upon seeing the victims' black Mustang, Looney said, "There's my car right there. That's the one I want."
Dempsey and Hertz went to the victims' front door as a decoy and asked if they could use the phone. King provided them with a cordless phone, and Dempsey feigned making a phone call. When Dempsey attempted to return the phone, Hertz pointed his gun at King and forced his way in. Looney then entered and pointed his rifle at Spears. Spears and King were bound and gagged with duct tape and placed face down on their bed. Hertz and his codefendants removed a significant amount of the victims' property, including a VCR, a television, jewelry, furniture, and CDs, and loaded the victims' belongings into the victims' two vehicles. Looney also found approximately $1500 of the victims' money in an envelope, which was ultimately divided equally among the three.
Hertz and Looney concluded that they could leave no witnesses and informed Dempsey of their decision. Dempsey said Hertz and Looney then poured accelerants throughout the victims' home. All three men, still armed, went to the bedroom where the victims were bound, side-by-side, face down on their bed. When they entered the back bedroom, King said that she would "rather die being burnt up than shot." She stated, "Please, God, don't shoot me in the head." Hertz replied, "Sorry, can't do that," and then he proceeded to open fire; Looney followed and then Dempsey. The victims died as a result of the gunshot wounds.
Subsequent to the shootings, the victims' home was set ablaze. Hertz drove away in the victims' white Ford Ranger, *1034 and Looney drove the victims' black Ford Mustang, with Dempsey as a passenger. According to Dempsey, the whole episode at the victims' home lasted about two hours. The trio proceeded to Hertz's house and unloaded the stolen items and divided up the money. Two employees at the Wal-Mart in Tallahassee testified that the three men made purchases at the store at around 5 a.m. the morning of the murders, before "showing off" their new vehicles, i.e., a black Mustang and a white Ford Ranger, to both of the employees. A Wal-Mart receipt for a clothing purchase was later found in the victims' Mustang, corroborating the employees' testimony.
Hertz and his codefendants made their way to Daytona Beach Shores where, later that day, they were involved in a pursuit and shootout with police. Looney and Dempsey were arrested after abandoning and fleeing from the victims' black Mustang. Hertz abandoned the victims' Ford Ranger after being shot, and he paid a cabdriver $100 to drive him to his aunt's house in St. Augustine. Hertz was arrested that same day in St. Augustine, and victim Spears' .9mm gun was recovered from Hertz's bag.
Id. at 635-36.

The Competency Hearing
Prior to trial, defense counsel Robert Rand ("Rand") filed a motion to declare Hertz incompetent to stand trial. This motion was based on the inability of Hertz to recall details of the events preceding his arrest or to understand the pretrial process, and on the opinions of two mental health experts, forensic psychologist Dr. Michael T. D'Errico and neuropsychologist Dr. Joseph Sesta, that Hertz was incompetent to stand trial. On April 7, 1999, a competency hearing was conducted. See id. at 640. Among the witnesses presented by the defense at the competency hearing were two mental health experts, Dr. D'Errico and Dr. Sesta, both of whom provided interpretations of various psychological tests administered to Hertz. See id. Subsequent to the hearing, the trial court issued an order declaring Hertz competent.

The Guilt Phase
The evidence presented during the guilt phase of Hertz's trial was summarized in this Court's opinion affirming his convictions on direct appeal, as follows:
A firearms expert with FDLE testified that one of the bullets recovered from the area of the victims' burned bed was fired from the .380 Lorcin handgun recovered from Looney at the time of his arrest in Daytona Beach, i.e., the same handgun owned by Keith Spears and used, according to Dempsey, by Hertz to shoot the victims. The other bullet was fired from a .30 caliber carbine rifle, not inconsistent with .30 caliber rifle used by Looney to shoot the victims, and later recovered in the victims' Mustang. A roll of duct tape, Looney's wallet with $464, and Dempsey's wallet with $380 were also found in the Mustang. A fingerprint analyst with FDLE analyzed latent fingerprints taken from the Mustang and concluded that Hertz and his codefendants had all touched the car. The chemist found evidence of various accelerants on items of clothing found in the Mustang. In addition, a law enforcement investigator with the State Fire Marshal's Office testified that the kind of damage that was done by the fire does not happen unless an accelerant is used.
The state medical examiner testified that the bodies were severely burned. He graphically detailed the condition of the bodies as depicted in the photographs: *1035 the legs were burned off below the knees, the hands were burned to nubs, the bones of the arms were fractured by the fire, and the skulls were burned partially away. The victims had to be positively identified by dental records. The medical examiner also testified that there could have been other injuries that were not detected due to the extensive burns.
King was shot at least two times in the head, which caused her death. However, the medical examiner was not able to trace the path of the bullet because the skull was burned away. He testified that it was possible that other bullets struck the body, which could not be determined because of the fire. King lived one to two minutes after she was shot. However, there was no soot in the trachea, indicating that she was not alive when the fire started. Spears was shot at least one time in the head, which caused his death. The bullet went in the back of the neck and exited above the right eye. Spears also lived one to two minutes after he was shot, and again, no soot was discovered in his trachea, meaning that he was dead at the time of the fire. The defense did not present any evidence.
Id. at 636-37.

The Penalty Phase
At the penalty phase, the State presented three witnesses. Reginald Byrd, a probation officer, provided evidence that Hertz was in violation of his felony probation status on July 7, 1997, when he committed the murders in the instant case. Karen King and Janet Spears, the mothers of victims Melanie King and Keith Spears, respectively, both read previously prepared victim impact statements into the record.
The defense presented six witnesses: four relatives of Hertz, Dr. D'Errico, a mental health expert, and Donnie Williams, a Wakulla County deputy sheriff.[1] Family members presented evidence directed to many aspects of Hertz's background. Dr. D'Errico diagnosed Hertz as having Attention Deficit Hyperactivity Disorder ("ADHD") and discussed other results of his psychological testing. The defense also presented evidence in a thick book of background materials to portray Hertz's life.
In entering a sentence of death, the trial judge found seven individual aggravating factors: (1) that the murders were committed by a person convicted of a felony and who was on felony probation; (2) that the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (3) that the murders were committed while the defendant was engaged in the commission of a burglary, arson, and robbery; (4) that the murders were committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (5) that the murders were committed for financial gain; (6) that the murders were especially heinous, atrocious or cruel ("HAC"); and (7) that the murders were committed in a cold, calculated, and premeditated manner without pretense of moral or legal justification. See id. at 637.
In mitigation, the trial court found two statutory mitigators: (1) an impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law (some weight); and *1036 (2) his age (moderate weight). With respect to nonstatutory mitigation, the trial court found (1) a difficult childhood (significant weight); (2) no significant criminal history, no history of violence, and that Hertz posed no problems since his incarceration (marginal weight); (3) Hertz showed remorse and cried during some of the testimony and when he made his statement to the court (moderate weight); (4) society would be adequately protected if Hertz were given a life sentence without the possibility of parole (no weight); (5) codefendant Dempsey received a life sentence following a plea (significant weight). See id. at 637-38.
In imposing the sentence of death, the trial judge noted that "[a] review of all the evidence causes the evidence of mitigation to pale into insignificance considering the enormity of the proven and appropriately considered aggravating factors."

Direct Appeal
On direct appeal, this Court affirmed the murder convictions and death sentences, denying all appellate claims,[2] none of which are relevant to the instant postconviction appeal. See Hertz, 803 So.2d at 654. In June 2002, certiorari was denied by the United States Supreme Court. See Hertz v. Florida, 536 U.S. 963, 122 S.Ct. 2673, 153 L.Ed.2d 846 (2002).

Rule 3.851 Proceedings
On June 30, 2003, Hertz filed a rule 3.851 motion for postconviction relief. On March 9, 2004, Hertz filed an amended rule 3.851 motion which elaborated on his original claim that trial counsel was ineffective at the penalty phase for failing to present all available mental health mitigation.[3] On March 11, 2004, the trial court held a Huff[4] hearing to determine whether an evidentiary hearing on any collateral claims was warranted. In a post-Huff hearing filing, the State conceded that Hertz was entitled to an evidentiary hearing on the issue of trial counsel's failure to present all available mental health mitigation at the penalty phase.
*1037 At the July 27, 2004, evidentiary hearing, Hertz presented Dr. Bill Mosman, a forensic psychologist who testified that Hertz had organic brain damage and was functioning at the mental age of fourteen. Dr. Mosman explained that this conclusion was based in large part on a 39-point differential in performance and verbal IQ scores when Hertz was tested. Cross-examination revealed that Dr. Mosman had reviewed neither the competency hearing, the guilt phase trial transcripts, nor the defense exhibits from the penalty phase. Dr. Mosman admitted that his opinion regarding Hertz's brain damage and mental age was simply a different interpretation of the test results from that offered by a defense witness, Dr. D'Errico, during the penalty phase of the trial. Subsequent to the evidentiary hearing, the trial court denied the claims advanced by Hertz for postconviction relief based in large part on the determination that the trial court did not find Dr. Mosman to be a convincing witness. This appeal followed.

ANALYSIS
Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that
[a] claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Downs v. State, 453 So.2d 1102 (Fla. 1984). A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). The alleged ineffective assistance of counsel claim is a mixed question of law and fact, subject to plenary review based on Strickland. See Stephens v. State, 748 So.2d 1028, 1032 (Fla.1999). Under this standard, the Court conducts an independent review of the trial court's legal conclusions, while giving deference to the factual findings of the trial court. See id. at 1032-33.
A trial court's determination of the credibility of witnesses and the weight to be given the evidence will be provided great deference. We have explained that "[s]o long as the [trial court's] decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence." Arbelaez v. State, 898 So.2d 25, 32 (Fla.2005) (quoting Sochor v. State, 883 So.2d 766, 781 (Fla. 2004)). This deference is a recognition of "the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact." Porter v. State, 788 So.2d 917, 923 (Fla.2001).
There is a presumption that trial counsel's performance was not ineffective. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052. A fair assessment of attorney performance requires that efforts be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the *1038 time. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. The defendant carries the burden to overcome the presumption of effective assistance and that, under the circumstances, the challenged action could be considered sound trial strategy. See id. at 689, 104 S.Ct. 2052. Our review of counsel's performance is highly deferential. See id.

The Diminished Capacity Mitigator
Hertz alleges that the trial court did not give significant weight to his diminished capacity to appreciate the criminality of his conduct factor because trial counsel failed to present the testimony of Dr. Sesta as to brain dysfunction.[5] Specifically, Hertz asserts that had Dr. Sesta's findings of frontal lobe deficit been presented, the trial court and jury would have realized that the capacity of Hertz to control his behavior was substantially impaired as a result of this condition. Hertz points to Dr. Sesta's testimony at the competency hearing, wherein the doctor explained that the frontal lobe of the brain "is what separates the behavior of a five year old from the behavior of a thirty year old. It essentially provides the breaks for human behavior." Hertz argues that the failure of counsel to bring out this powerful evidence during the penalty phase constituted ineffective assistance of counsel.
In the sentencing order, the trial court found that the capacity of Hertz to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was a mitigating factor. With respect to the decision to afford the mental problems only "some weight," the trial court explained:
With respect to the defendant's mental status and his attention deficit disorder, the Court is reasonably convinced that the defendant has this disorder which has been so diagnosed but finds that his condition was adequately attended by medication. It is also noted that in two competency hearings, this Court as well as another circuit court in Florida have found the defendant was competent and have so ruled. The evidence does not support any finding or conclusion that the capacity of the defendant to conform his conduct to the requirements of law and to appreciate the criminality of his conduct was substantially impaired, accordingly, while entitled to some weight it was not entitled to moderate weight.
As mentioned above, the weight to be given to the evidence is a trial court decision entitled to reasonable deference on appeal. See Arbelaez, 898 So.2d at 32.
It is clear from the record that trial counsel presented during the penalty phase ample evidence of the mental health problems and history Hertz experienced. His mother and grandmother both testified that Hertz had been diagnosed as having Attention Deficit Hyperactivity Disorder ("ADHD"). Evidence was presented that his behavior improved markedly when he was taking the Ritalin the doctors prescribed but he was not consistently provided the medication. In addition to lay testimony, Rand also presented *1039 expert testimony from Dr. D'Errico. After personally examining Hertz and reviewing all of his records, both mental health and otherwise, Dr. D'Errico agreed that the ADHD diagnosis was correct. Dr. D'Errico also addressed cognitive testing that he performed which revealed a 39-point differential in performance and verbal IQ scores. In explaining the significance of this disparity, Dr. D'Errico was of the opinion that although this point differential would "suggest to me that some brain damage had occurred . . . [a]fter a neuropsychological evaluation . . . it was apparent that the difference was due to developmental reasons . . . [because] he was raised in a home where spoken language was not used." (Emphasis added.)
The current assertion that the testimony of Dr. Sesta would have provided more compelling evidence as to the diminished capacity mitigator is refuted by the record. Although Dr. Sesta did testify during the competency hearing with regard to "flagrant deficits in frontal [lobe] functions," he later elaborated that the 39-point IQ differential on which he based this conclusion represented "a neurodeficit developmental disorder . . . consistent with in part with some of the defendant's upbringing in a nonverbal household, being raised by deaf parents, as well as the presence of other forms of psychiatric disorder, ADHD and learning disability." On cross-examination, Dr. Sesta testified that he found no indication of retardation, borderline intellectual functioning, or Axis I major mental illness. Dr. Sesta described Hertz as having a "cognitive disorder not otherwise specified which iswhich described the functioning of his brain that we discussed earlier with his poor verbal skills versus intact visual skills and the frontal lobe deficits that he had." In the order denying rule 3.851 relief, the trial court stated:
The record reflects that Dr. Sesta, a neuropsychologist, did not find brain "damage." . . . He found "no indication of neurological disease or trauma"; no indication of "retardation," or "borderline intellectual functioning", or any major Axis I mental illness. . . . [H]e gave him a diagnosis of "cognitive disorder not otherwise specified" to describe the functioning of the defendant's brain with very poor verbal skills and frontal lobe deficits that he had found. His final analysis was that the defendant had a "neurodeficient developmental disorder." He interpreted this "as being consistent with in part some of his upbringing in a non-verbal household, being raised by deaf parents, as well as his ADHD and learning disability which indicated some brain dysfunction."
However, even if the trial court's assessment of Dr. Sesta's final diagnosis is in dispute, trial counsel cannot be faulted for failing to call Dr. Sesta as a witness at the penalty phase because he had a valid strategic reason for his decision.
Rand testified at the postconviction evidentiary hearing that he did not call Dr. Sesta as a witness at the penalty phase based on his weakness during cross-examination at the competency hearing. In the order denying rule 3.851 relief, the trial court stated:
After seeing what happened to Dr. Sesta on cross examination . . . [Rand] decided that the doctor was not a good witness and not that helpful. Among other things, Dr. Sesta testified as to possible frontal lobe damage on direct examination, then essentially backed off that testimony upon cross examination.
Additionally, Dr. Sesta admitted on cross-examination that Hertz could "certainly" be faking his test results by performing well when he chose to do so.
This Court has held that "strategic decisions do not constitute ineffective assistance *1040 of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Howell v. State, 877 So.2d 697, 703 (Fla.2004) (quoting Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000)). In the instant case, Rand made a strategic decision that he would not use Dr. Sesta as a witness at the penalty phase because Dr. Sesta had not been a good witness at the competency hearing. Rand was of the view that on cross-examination during the competency hearing, Dr. Sesta had retracted his conclusion that the IQ score differential indicated that Hertz had frontal lobe damage. Rand's decision is supported by the trial court's observation that Dr. Sesta did not find any brain "damage." The poor performance of Dr. Sesta on cross-examination during the competency hearing and the trial court's conclusion that Dr. Sesta found no brain damage demonstrate that the decision to not use Dr. Sesta as a witness at trial was clearly within "the broad range of reasonably competent performance" contemplated by the Supreme Court in Strickland and does not undermine our confidence in the outcome of the proceedings below. See Strickland, 466 U.S. at 687, 694, 104 S.Ct. 2052.

The Extreme Mental Illness Mitigator
Hertz alleges that the testimony of forensic psychologist Bill Mosman at the postconviction evidentiary hearing demonstrates that trial counsel clearly failed to properly develop and present the statutory mitigator of extreme mental or emotional disturbance. Dr. Mosman testified that based on interviewing Hertz and reviewing both his mental health and other records, it was his opinion that Hertz suffered from incurable organic brain damage which had a genetic origin. Dr. Mosman agreed with Dr. Sesta's assessment that the large point differential in Hertz's verbal and performance IQ scores indicated frontal lobe damage. It was Dr. Mosman's opinion that there was no reason, strategic or otherwise, for not presenting evidence of this compelling mitigator.
Although Dr. Mosman's firm stance that the test results indicate brain damage in the frontal lobe could have benefited Hertz if presented during his penalty phase, this Court has repeatedly emphasized that a reasonable investigation into mental health mitigation "is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert." Asay v. State, 769 So.2d 974, 986 (Fla.2000); see also Davis v. State, 875 So.2d 359, 371 (Fla.2003) ("[T]rial counsel was not deficient where the defendant had been examined prior to trial by mental health experts and the defendant was simply able to secure a more favorable diagnosis in postconviction.") (citing Asay). In this case, the trial court stated that defense counsel
conducted a very thorough investigation of the defendant's entire life, encompassing all areas of his upbringing, including discussing the defendant's hardships, difficulties and troubles with family members and reviewed and obtained all schooling and medical records, psychological history, disciplinary history, and criminal history. . . .
[Counsel] made a strategic and reasonable decision as to presenting this information through the mental health expert he utilized.
Rand's assistance is not considered ineffective simply because Hertz was able to locate a mental health expert to testify more favorably at the postconviction evidentiary hearing.
Additionally, even if the alleged additional mitigation that Dr. Mosman found could have been discovered by Rand and presented at the penalty phase, the trial *1041 judge determined that Dr. Mosman's testimony at the evidentiary hearing as to both the asserted brain damage and that Hertz was functioning at the mental age of a fourteen-year-old was not credible. In the order denying collateral relief, the trial court stated:
There is no evidence in the record to lend weight that any mental age or extreme mental disturbance mental health mitigator asserted by Dr. Mosman, as either statutory or nonstatutory, contributed to the defendant's actions in committing his crimes. Dr. Mosman's testimony likely would have been entitled to insignificant weight had it been presented in the penalty phase. His asserted additional statutory mitigators are without basis in the record and clearly conflict with the evidence of the defendant's conduct and behavior presented during trial. He was not familiar with the significant facts and circumstances or the evidence presented during the guilt phase and his assertions of mitigation were somewhat conjectural. Dr. Mosman essentially presented no other supportable credible mitigation that would have been found that was not presented by trial counsel through the expert and lay witnesses presented. The defendant has simply presented an additional mental health expert with different conclusions than those of the expert relied upon by trial counsel. There has been no convincing demonstration that the evaluation of trial counsel's expert was insufficient. The penalty phase jury was aware of most, if not all, of the mitigation regarding the defendant's background and childhood.
This Court has established that it will not substitute its judgment for that of a trial court on the credibility of witnesses if the trial court's judgment is supported by competent, substantial evidence. See Porter, 788 So.2d at 923. The trial court order here describes the evidence as follows:
Upon cross examination, Dr. Mosman admitted that he had not read the defendant's guilt phase trial transcripts but had read only the penalty phase. . . .
He also admitted that he had not read the defendant's competency hearing transcripts during which three doctors: Dr. D'Errico, Dr. Sesta, and Dr. Conger, testified, nor had he read the competency hearing evaluation. He talked to Dr. Sesta and reviewed his report, but had not talked to Dr. D'Errico or Dr. Conger, nor read their reports. . . .
[He] further acknowledged that he had not talked to the defendant's trial attorney, Robert Rand, with respect to his presentation of the defendant's mitigation, had not read defense counsel's argument, had no knowledge of and had not read the exhibit introduced into evidence and argued by Mr. Rand during the penalty phase which compiled a complete, detailed and extensive history of the defendant's background and all of his records, and also conceded that he did not know everything that the defendant's trial attorney presented.
These circumstances support the trial court's determination that Dr. Mosman's testimony would have been given insignificant weight even if it had been presented at trial.
Hertz relies on State v. Lara, 581 So.2d 1288 (Fla.1991), as supporting his assertion that Rand was ineffective for failing to present evidence of extreme emotional disturbance. Lara is inapposite here because it is clearly distinguishable. In Lara, this Court stated that defense counsel "failed to present testimony of mental health experts regarding the defendant's diminished mental capacity" and "should have investigated and prepared [mental health mitigation] *1042 for presentation to the jury as evidence in mitigation at penalty phase." Lara, 581 So.2d at 1289 (quoting trial court's order). In the instant matter, the trial court specifically concluded that
[c]ounsel did conduct a very thorough and reasonable investigation of mental health mitigation prior to trial and made a strategic and reasonable decision as to presenting this information through the mental health expert he utilized.
Based on this record, we conclude that defense counsel did perform a reasonable investigation into mental health mitigation and that the alleged additional mental health mitigation presented in Dr. Mosman's testimony deemed unconvincing by the trial court does not undermine our confidence in the proceedings below.

The Statutory Age Mitigator
Hertz asserts that his attorney failed to properly present the statutory age mitigator because counsel did not emphasize that the mitigator is intended to encompass both emotional and mental age as well as chronological age. Dr. Mosman testified that Hertz had a mental age of fourteen. Hertz asserts that the State did not contest Dr. Mosman's opinion on this point and instead attempted to discredit him by directing the Court to another recent capital case in which Dr. Mosman opined in postconviction proceedings that the defendant's mental age was also fourteen. The trial court found Dr. Mosman's testimony with regard to the mental age of the defendant to be unpersuasive and concluded that there was no evidence in the record which would lend weight to the notion that any mental age mitigator was applicable.
A statutory age mitigator was found by the trial court and given "only moderate weight" "in light of all the facts and circumstances" surrounding the crime. Rand testified at the evidentiary hearing that Dr. Mosman's testimony in postconviction was the first he had heard of Hertz having a mental age of fourteen. This Court has stated that trial counsel is not "ineffective for failing to pursue every possible defense based on a particular mental condition." Jackson v. Dugger, 547 So.2d 1197, 1200 (Fla.1989). Additionally, this Court has stated that "[c]ounsel cannot be deemed ineffective . . . simply because he relied on what might have been less than complete pretrial psychiatric evaluations." State v. Sireci, 502 So.2d 1221, 1223 (Fla.1987). Even if Dr. Mosman's conclusion as to the mental age of Hertz was correct, Rand would not have been ineffective for relying on the expert evaluation by Dr. D'Errico, who did not make such a finding.
Defense counsel was unaware of any theory that the defendant's possible mental age was fourteen, and the trial court found Dr. Mosman's testimony on this point not to be credible. Therefore, in our view, Rand was not ineffective for failing to present this mitigator, and our confidence in the proceedings below is not undermined by Rand's failure to present this issue at the penalty phase.

The Nonstatutory Mitigation
Hertz also asserts that Rand failed to present evidence of available and relevant nonstatutory mitigation. Specifically, Hertz alleges that Rand failed to present evidence with regard to the following six issues: (1) an ability to be a positive person in the prison system; (2) genetic defects; (3) brain damage; (4) the impact upon mental health caused by a clubfoot deformity and by the surgeries to remedy that condition; (5) a family history of deafness; and (6) a history of drug and alcohol abuse. As the State correctly asserts, trial counsel either presented evidence as to each of these issues or had a reason for not doing so.
*1043 The assertion that Hertz had the ability to be rehabilitated or to be a positive person in the prison system was refuted by several facts established at trial. The State established that Hertz was in violation of felony probation on the date of the murders in the instant case and he was also involved in a shootout with police in an attempt to escape apprehension after he committed the murders. See Hertz, 803 So.2d at 636.
Rand presented ample evidence of genetic defects, specifically the clubfoot condition. Family members testified that Hertz was born with a clubfoot which was difficult to correct partially because of their own medical neglect. The trial court even mentioned the struggles Hertz encountered with this condition in the sentencing order, stating that "[e]vidence and argument was presented that the defendant was born with a physical disability (club foot)." The trial court considered this genetic defect and "was reasonably convinced that the defendant did suffer hardships during his youth and should be given significant weight."
Hertz alleges that Rand failed to present evidence of his brain damage. As mentioned above, this alleged "brain damage" theory was presented by Dr. Mosman at the postconviction evidentiary hearing. The trial court found Dr. Mosman's testimony unconvincing. Even if the trial court had found Dr. Mosman's opinion on this point convincing, it still would have simply been a more favorable opinion of a new and different doctor postconviction which would not have rendered Rand's reliance on other expert opinions ineffective assistance of counsel. See Asay v. State, 769 So.2d at 986. Additionally, ample evidence of the mental health problems was in fact presented through the testimony of Dr. D'Errico during the penalty phase.
In a similar manner, the family history of deafness was presented at trial. The trial court specifically mentioned in the sentencing order that Hertz was born to a deaf mother and a partially deaf father. This was considered as part of a difficult childhood to which the trial court gave significant weight in terms of mitigation.
Evidence of the long history of drug abuse was also presented at trial. Family members all testified that his parents were both drug addicts and would steal to support their drug habits. His father even testified that he gave Hertz marijuana when Hertz was only eight years old. Again, the trial court considered in the sentencing order that Hertz's parents were "addicted to drugs and unable to provide a stable environment" for him.
Hertz directs our attention to Heiney v. State, 620 So.2d 171 (Fla.1993), to support his assertion that Rand was ineffective in failing to investigate and present the nonstatutory mitigators discussed above. Heiney is inapposite in this case because it is clearly distinguishable. In Heiney, this Court stated that defense counsel "totally fail[ed] to investigate potential mitigating factors." Heiney, 620 So.2d at 172. Here, on the other hand, the trial court found that "[c]ounsel did conduct a very thorough and reasonable investigation of mental health mitigation prior to trial."
In our view, all of the nonstatutory mitigation which is now advanced as having not been presented at trial was, in fact, presented during the penalty phase. Defense attorney Rand clearly provided effective representation on this point and our confidence in the outcome of the proceedings below is not undermined.

The Method of Presenting Mitigation
Hertz claims that Rand was ineffective for failing to present the mitigation he did address during trial in an effective *1044 manner. He points to the failure of Rand to specifically mention the statutory mitigators individually in his opening or closing statements to the jury at the penalty phase. Hertz also stresses that the State enumerated seven aggravators during its opening statement at the penalty phase that it intended to present to the jury. Hertz alleges that Rand should have enumerated each mitigator individually and required that the jury be instructed on them in that manner so as to have presented more mitigators than the State enumerated as aggravating factors.
In the order denying postconviction relief, the trial court addressed the issue of enumerating the mitigators and concluded that:
Even if the mitigation evidence presented had been enumerated as argued on postconviction relief, it has been repeatedly held by appellant [sic] majorities that a laundry list of enumeration of mitigation aspects, factors or circumstances relating to a defendant's character, record and background is not required to supplant the standard Section 941.141(6)(h) approved jury instruction form. Such a specific enumeration may raise a spectre of impermissible double consideration of the same mitigation aspects, factors or circumstances and create real risk of misleading a jury into not considering some mitigation aspect with respect to a defendant's background, character, or record that it has heard because it has not been included in any enumeration. The standard jury instructions do not instruct a jury that aggravators are statutory or that certain mitigators are statutory and others nonstatutory. The mitigation presented would not have been provided any more impact or weight for its consideration if it had been given multiple enumeration for multiplicative matching purposes with respect to the State's aggravators.
The jury was not left with the impression that the mitigation they could consider was limited nor that mitigation not specifically designated as statutory could not impact or be weighed against the State's statutory aggravators. Furthermore, counsel made it clear and ably argued that any mitigator could outweigh all of the aggravators argued by the State.
With respect to Hertz's general argument regarding counsel's method of presenting mitigation, these methods are clearly trial strategy. This Court has established that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Howell v. State, 877 So.2d 697, 703 (Fla.2004) (quoting Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000)). Rand testified at the evidentiary hearing that he attempted to convey Hertz's powerful life story through both an extensive history book admitted into evidence and live testimony of witnesses. Explaining his decision to present the background in this manner, Rand testified:
I felt like Mr. Hertz had a story to tell in the penalty phase that was very compelling. I wanted the jury to have the underlying facts and the support for the argument we were making. I thought it was important that they have the ability to look hands-on at the bits and pieces of the life. By the same token I felt that the argument that we were making was one that needed not to bog down in minutia, in detail, in papers, in trivia. So I tried to give the jury both. I tried to give them the minutia and the paper on the one hand in a form that they could take with them into the jury room, and I tried to create a mental image in *1045 their mind through argument of what this says and refer to it. . . .
After weighing all postconviction testimony, the trial court did not find Rand's performance ineffective and we agree.

CONCLUSION
Hertz has failed to satisfy the burden required by Strickland. All of the additional mitigators that Hertz asserts were not presented during the penalty phase were either presented or not supported by the record. Additionally, defense counsel's decisions regarding which mental health expert to utilize during the penalty phase and his manner of presenting a book of evidence which extensively detailed Hertz's background were reasonable trial strategies. Based on the foregoing, Hertz was provided effective assistance of counsel and none of the testimony presented at the postconviction evidentiary hearing undermines our confidence in the proceedings below. Therefore, we affirm the denial of postconviction relief under rule 3.851.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Officer Williams was used to rebut testimony by a codefendant which is not relevant to the instant postconviction appeal.
[2] In its opinion affirming the convictions, this Court detailed Hertz's direct appeal claims as follows:

(1) The trial court improperly excused for cause a venire member whose opposition to the death penalty did not prevent or substantially impair her ability to perform her obligations; (2) Hertz was not competent to stand trial; (3) the trial court erred by admitting gruesome photographs of the bodies at the crime scene and the autopsy; (4) the details of the collateral crimes in Volusia county became a feature of the trial causing prejudice that substantially outweighed the probative value of the evidence; (5) the evidence was insufficient as a matter of law to sustain the convictions; (6) the statute authorizing the admission of victim impact evidence is an unconstitutional usurpation of the Court's rulemaking authority under article V, section 2, of the Florida Constitution, making the admission of such testimony unconstitutional and reversible error; (7) the trial court erred in denying the defense motion to require a unanimous verdict; (8) four of the seven aggravating factors upon which the jury was instructed and which the trial court found are legally inapplicable and their consideration was not harmless error; and (9) the death sentence in this case is disproportionate.
Hertz, 803 So.2d at 638 n. 2.
[3] In his written closing arguments following the postconviction evidentiary hearing, Hertz abandoned his original claims of ineffective assistance of counsel for failure to seek a venue change and failure to object to inadmissible victim impact statements. This left only the ineffectiveness claim relating to penalty phase mental health mitigation, which is the subject of the instant appeal, and a claim under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which the trial court denied in the order on postconviction relief.
[4] Huff v. State, 622 So.2d 982 (Fla.1993).
[5] Dr. Sesta's findings resulted from cognitive tests performed as part of his competency evaluation of Hertz. While we acknowledge that a competency evaluation is undertaken for a different purpose than a mental heath evaluation to consider mitigation, see Rutherford v. State, 727 So.2d 216, 222 n. 3 (Fla. 1998), the scientific underpinnings and testing are often the same for either evaluation. In fact, in the instant matter the cognitive tests that Dr. D'Errico discussed during the penalty phase were actually originally performed by Dr. D'Errico as part of his competency evaluation of Hertz. Therefore, assertions regarding the possible value of Dr. Sesta's findings if presented during the penalty phase are appropriate if well founded.