# Supreme Court of Florida

_____

No. SC17-456
_____

**GUERRY WAYNE HERTZ,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[May 18, 2017]

PER CURIAM.

This case is before the Court on the petition of Guerry Wayne Hertz for a

writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(9), Fla. Const.

## FACTS

We previously detailed the facts surrounding Hertz's case on his direct

appeal:

> In the early morning hours of July 27, 1997, the charred bodies
> of Melanie King and Robin Keith Spears were found in the victims'
> burning home in Wakulla County, Florida. Hertz, Jason Looney, and
> Jimmy Dempsey were each indicted for the first-degree murders of
> the victims, and each codefendant was also charged with burglary of a
> dwelling while armed, armed robbery with a firearm, arson of a
> dwelling, and use of a firearm during the commission of a felony as a
> result of this incident. Prior to trial, codefendant Dempsey negotiated

a plea with the State and was sentenced to consecutive life sentences in return for providing his testimony at Hertz and Looney's joint trial.

The evidence presented at the trial revealed the following facts. At approximately 11 p.m. on July 26, 1997, Hertz and his codefendants left an acquaintance's house on foot within walking distance from the victims' home. All three men were armed with guns. A resident who lived about 500 yards from the victims testified that Hertz appeared at her door at about 2 a.m. asking to use her phone because "his truck had broken down." When she refused, the trio continued down the road towards the victims' home and, upon seeing the victims' black Mustang, Looney said, "There's my car right there. That's the one I want."

Dempsey and Hertz went to the victims' front door as a decoy and asked if they could use the phone. King provided them with a cordless phone, and Dempsey feigned making a phone call. When Dempsey attempted to return the phone, Hertz pointed his gun at King and forced his way in. Looney then entered and pointed his rifle at Spears. Spears and King were bound and gagged with duct tape and placed face down on their bed. Hertz and his codefendants removed a significant amount of the victims' property, including a VCR, a television, jewelry, furniture, and CDs, and loaded the victims' belongings into the victims' two vehicles. Looney also found approximately $1500 of the victims' money in an envelope, which was ultimately divided equally among the three.

Hertz and Looney concluded that they could leave no witnesses and informed Dempsey of their decision. Dempsey said Hertz and Looney then poured accelerants throughout the victims' home. All three men, still armed, went to the bedroom where the victims were bound, side-by-side, face down on their bed. When they entered the back bedroom, King said that she would "rather die being burnt up than shot." She stated, "Please, God, don't shoot me in the head." Hertz replied, "Sorry, can't do that," and then he proceeded to open fire; Looney followed and then Dempsey. The victims died as a result of the gunshot wounds.

Subsequent to the shootings, the victims' home was set ablaze. Hertz drove away in the victims' white Ford Ranger, and Looney drove the victims' black Ford Mustang, with Dempsey as a passenger. According to Dempsey, the whole episode at the victims' home lasted about two hours. The trio proceeded to Hertz's house and unloaded the stolen items and divided up the money. Two employees at the

Wal-Mart in Tallahassee testified that the three men made purchases at the store at around 5 a.m. the morning of the murders, before "showing off" their new vehicles, i.e., a black Mustang and a white Ford Ranger, to both of the employees. A Wal-Mart receipt for a clothing purchase was later found in the victims' Mustang, corroborating the employees' testimony.

Hertz and his codefendants made their way to Daytona Beach Shores where, later that day, they were involved in a pursuit and shootout with police. Looney and Dempsey were arrested after abandoning and fleeing from the victims' black Mustang. Hertz abandoned the victims' Ford Ranger after being shot, and he paid a cabdriver $100 to drive him to his aunt's house in St. Augustine. Hertz was arrested that same day in St. Augustine, and victim Spears' .9mm gun was recovered from Hertz's bag.

A firearms expert with FDLE testified that one of the bullets recovered from the area of the victims' burned bed was fired from the .380 Lorcin handgun recovered from Looney at the time of his arrest in Daytona Beach, i.e., the same handgun owned by Keith Spears and used, according to Dempsey, by Hertz to shoot the victims. The other bullet was fired from a .30 caliber carbine rifle, not inconsistent with [a] .30 caliber rifle used by Looney to shoot the victims, and later recovered in the victims' Mustang. A roll of duct tape, Looney's wallet with $464, and Dempsey's wallet with $380 were also found in the Mustang. A fingerprint analyst with FDLE analyzed latent fingerprints taken from the Mustang and concluded that Hertz and his codefendants had all touched the car. The chemist found evidence of various accelerants on items of clothing found in the Mustang. In addition, a law enforcement investigator with the State Fire Marshal's Office testified that the kind of damage that was done by the fire does not happen unless an accelerant is used.

The state medical examiner testified that the bodies were severely burned. He graphically detailed the condition of the bodies as depicted in the photographs: the legs were burned off below the knees, the hands were burned to nubs, the bones of the arms were fractured by the fire, and the skulls were burned partially away. The victims had to be positively identified by dental records. The medical examiner also testified that there could have been other injuries that were not detected due to the extensive burns.

King was shot at least two times in the head, which caused her death. However, the medical examiner was not able to trace the path

of the bullet because the skull was burned away. He testified that it was possible that other bullets struck the body, which could not be determined because of the fire. King lived one to two minutes after she was shot. However, there was no soot in the trachea, indicating that she was not alive when the fire started. Spears was shot at least one time in the head, which caused his death. The bullet went in the back of the neck and exited above the right eye. Spears also lived one to two minutes after he was shot, and again, no soot was discovered in his trachea, meaning that he was dead at the time of the fire. The defense did not present any evidence.

Hertz v. State, 803 So. 2d 629, 635-37 (Fla. 2001).

Hertz was convicted and sentenced to death for the first-degree murders of Melanie King and Robin Keith Spears. Id. at 637. A jury recommended a sentence of death by a vote of ten to two, and the trial court sentenced Hertz to death for both murders. Id.

> [T]he trial court found as aggravating factors that (1) the capital felony was committed by a person convicted of a felony and who was on felony probation; (2) the capital felony was committed by a person previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (3) the capital felony was committed while Hertz was engaged in the commission of a burglary, arson, and robbery; (4) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (5) the murder was committed for financial or pecuniary gain (the court merged this aggravating factor with the fact that the capital felony was committed during the course of a burglary, arson, or robbery); (6) the murder was especially heinous, atrocious, or cruel, and (7) the murder was cold, calculated, and premeditated without any pretense of moral or legal justification.
>     In mitigation, the trial court found (1) Hertz's impaired capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was given some weight; (2) his age of 20, which was given only moderate weight; (3) as to all other nonstatutory mitigation, (a) Hertz's difficult childhood was given

- 4 -

significant weight; (b) the fact that Hertz had no significant criminal history or no history of violence and the fact that he posed no problems since being incarcerated were given marginal weight; (c) that Hertz's remorse and the fact that he cried during some of the testimony and when he made his statement to the court was given moderate weight; (d) the fact that society would be adequately protected if he were to be given a life sentence without the possibility of parole was entitled to "no weight" and (e) the fact that a codefendant, Dempsey, received a life sentence following a plea, was given significant weight and substantially considered by the trial court.

Id. at 637-38.

On direct appeal, we affirmed Hertz's convictions and sentences. Id. at 654. The United States Supreme Court denied certiorari review on June 28, 2002. Hertz v. Florida, 536 U.S. 963 (2002).

## ANALYSIS

We conclude that the appropriate action is to grant Hertz's petition, vacate his sentence, and remand for a new penalty phase. Here, the jury recommended death by a vote of ten to two. Thus, Hertz's death sentence violated the central holding in Hurst v. State: all critical findings for the imposition of death must be found unanimously by the jury. Hurst v. State, 202 So. 3d 40, 44 (Fla. 2016).

In Mosley v. State, we held that Hurst applies retroactively to those postconviction defendants whose sentences became final after the United States Supreme Court's June 24, 2002, decision in Ring v. Arizona, 536 U.S. 584 (2002). Mosley v. State, 209 So. 3d 1248, 1283 (Fla. 2016). Hertz's conviction became

final on June 28, 2002. <u>Hertz</u>, 536 U.S. 963. Thus, Hertz falls within the category of defendants to whom <u>Hurst</u> is applicable.

Accordingly, the issue is then whether any error that occurred during the penalty phase was harmless beyond a reasonable doubt. Although three aggravating factors were necessarily found by a unanimous vote of the jury—(1) the capital felony was committed by a person convicted of a felony and who was on felony probation; (2) the capital felony was committed by a person previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; and (3) the capital felony was committed while Hertz was engaged in the commission of a burglary, arson, and robbery—whether these aggravating circumstances were "sufficient" to qualify Hertz for the death penalty would also be a jury determination. Because the jury vote was ten to two, there is no way of knowing if such a finding was unanimous. Moreover, there is no way of knowing if the jury found any of the other aggravating circumstances unanimously,[1] or if any aggravators that were unanimously found were also unanimously found to be sufficient to qualify for the death penalty.

---

1. Among the non-automatic aggravators were HAC and CCP—two of the weightiest aggravators in Florida. <u>Jackson v. State</u>, 18 So. 3d 1016, 1035 (Fla. 2009) ("Jackson has not contested the eight aggravating circumstances found by the trial court, which included two of the most serious aggravators (i.e., HAC and CCP).").

In sum, any attempt to determine what findings were made by the jurors who voted for life and the jurors who voted for death would amount to speculation and cannot rise to the level of proof beyond a reasonable doubt. Accordingly, the error in this case cannot be considered harmless. Thus, we grant the petition for a writ of habeas corpus, vacate Hertz's death sentence, and remand for a new penalty phase proceeding.

## CONCLUSION

Based on the foregoing, we grant the petition for a writ of habeas corpus, vacate Hertz's sentence, and remand for a new penalty phase proceeding consistent with <u>Hurst</u>.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY, POLSTON, and LAWSON, JJ., dissent.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Original Proceeding – Habeas Corpus

Clyde M. Taylor, Jr., of Taylor & Taylor, LLC, Saint Augustine, Florida; and Billy H. Nolas, Chief, Capital Habeas Unit, Office of the Federal Public Defender, Northern District of Florida, Tallahassee, Florida,

for Petitioner

No appearance for Respondent